[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Montgomery,* Slip Opinion No. 2016-Ohio-5487.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-5487

THE STATE OF OHIO, APPELLEE, *v*. MONTGOMERY, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Montgomery,* Slip Opinion No. 2016-Ohio-5487.]**

*Criminal law—Aggravated murder—Murder—Domestic violence—In a capital case, the aggravating circumstances codified in R.C. 2929.04(A) require the production of evidence sufficient to prove their existence beyond a reasonable doubt—Convictions and sentence of death affirmed.*

(No. 2012-1212—Submitted January 27, 2016—Decided August 24, 2016.)

APPEAL from the Court of Common Pleas of Franklin County,

No. 10CR-12-7125.

_____

FRENCH, J.

{¶ 1} On Thanksgiving Day 2010, appellant, Caron Montgomery, murdered his former girlfriend, Tia Hendricks; their two-year-old son, Tyron Hendricks; and Tia's nine-year-old daughter, Tahlia Hendricks. Montgomery entered a guilty plea to charges of murder, domestic violence, and aggravated murder with capital specifications. In 2012, a three-judge panel unanimously sentenced him to death

for the aggravated murders of Tyron and Tahlia and to 15 years to life in prison for Tia's murder.

{¶ 2} We now review Montgomery's direct appeal of right and, for the following reasons, affirm his convictions and sentence of death.

## I.    BACKGROUND

{¶ 3} Following Montgomery's arrest on November 27, 2010, appellee, the State of Ohio, charged him with two counts of aggravated murder with respect to each child: one for prior calculation and design under R.C. 2903.01(A) (Counts 2 and 4) and one for murder of a person under the age of 13 under R.C. 2903.01(C) (Counts 3 and 5).    All four aggravated-murder counts included capital specifications for course of conduct (R.C. 2929.04(A)(5)) and for murder of a child younger than 13 years old (R.C. 2929.04(A)(9)).    Counts 2 and 3, pertaining to Tahlia's murder, included a third capital specification for murder to escape detection, apprehension, trial or punishment for another offense (R.C. 2929.04(A)(3)).    The state also charged Montgomery with one count of murder under R.C. 2903.02(A) and one count of domestic violence under R.C. 2919.25(A) with respect to Tia Hendricks.

{¶ 4} Montgomery waived a jury trial and pleaded guilty to the indictment on May 7, 2012.  The three-judge panel then held a plea hearing as required by R.C. 2945.06.  The state presented the following evidence through its sole witness, Detective Dana Croom, a Columbus homicide detective and the lead detective in the investigation.

### A.    The State's Evidence

{¶ 5} On Thanksgiving morning, Columbus police received a 911 call from a female caller.  Croom testified at the plea hearing that the dispatcher "could hear [the female caller] yelling, 'Caron, Caron.' "    Police traced the call to Tia Hendricks's phone, and the dispatcher triangulated the call to 470 Rosslyn Avenue in Sharon Township.  Croom explained that the Rosslyn Avenue address was "less

than a hundred yards" from the apartment building where Tia resided, 465 Broadmeadows. However, officers were unable to locate the exact apartment from which the 911 call came.

**{¶ 6}** According to Croom, Tia's family contacted police on the day after Thanksgiving after becoming concerned that she and her children had not shown up for Thanksgiving dinner. Tia's coworkers were also concerned that she had not reported to work on Friday.

**{¶ 7}** Columbus police went to Tia's apartment. Although Croom was not one of the responding officers, he testified that police found no signs of forced entry. In fact, the door to Tia's apartment was locked from the *inside* with a chain lock, which officers cut with a bolt cutter. The chain part of the lock and the inside doorknob were smeared with what appeared to be blood. Officers discovered the bodies of Tia, Tahlia, and Tyron on the living room floor. All three were pronounced dead at the scene. According to Croom, a police lieutenant who checked the condition of the bodies described them as "cold," meaning that "they had been dead for a while."

**{¶ 8}** Tia was lying on her back, arms outstretched, with her head and upper torso covered by an article of clothing. Her blue jeans were undone and pulled slightly down, exposing her underwear, and there were several credit and identification cards and an unopened condom package askew on the floor near her head. Tahlia and Tyron were lying face up near the couch, their heads each covered with a blood-stained pillow.

**{¶ 9}** Officers discovered Montgomery alive and lying on the bed in the master bedroom. He appeared to be injured. Officers could not tell the extent of his injuries, but could see "a little bit of blood." Croom testified that "when the officers * * * eventually turned him over, he had a knife * * * barely in his neck. When they rolled him over to try to put him on the stretcher, the knife fell off onto the bed." Montgomery was treated for superficial injuries to his neck, arms, hands,

and the top of his head. Croom did not personally observe Montgomery's injuries, but he testified that the lieutenant who did opined that the injuries to his neck were "fresh."

{¶ 10} Croom testified that the police "had people who said that [Montgomery] had lived in [Tia's] apartment." And Tia's mother, Deborah Hendricks, told Croom that Tia and Montgomery had "argued a lot" during their off-and-on relationship. The state also introduced a Franklin County Municipal Court complaint charging Montgomery with domestic violence and assault against Tia and the related judgment entry indicating that in 2009, he had pleaded guilty to and was convicted of the domestic-violence charge.

{¶ 11} Croom also testified about the autopsies conducted by Deputy Franklin County Coroner Dr. Tae L. An on November 27 and 28, 2010. Tia's autopsy revealed 23 stab wounds to her neck, left flank, back, left shoulder, and right forearm. As described in the autopsy report, Dr. An concluded that Tia's death was caused by two stab wounds in particular, one that lacerated the left common carotid artery and one that lacerated the right internal jugular vein. In addition, Dr. An located more than 20 cutting wounds to the upper portion of Tia's body and found that these wounds contributed to her death. At the plea hearing, Croom opined that the wounds to Tia's hands and arms are "[c]ommonly referred to as defensive wounds."

{¶ 12} Tahlia's autopsy revealed five stab wounds around her neck and nine cutting wounds to her chin, right shoulder and right arm; Croom identified these as defensive wounds. The autopsy report indicated that stab wounds to the front of her neck severed the left and right common carotid arteries and the left internal jugular vein and caused her death.

{¶ 13} Tyron's autopsy revealed that "[o]ne large, widely gaping, incised wound" to the front of his neck lacerated the right internal jugular vein, trachea, and esophagus, causing his death. Croom testified that Dr. An found no defensive

4

wounds and that the wound to Tyron's neck was actually created by two separate injuries.

{¶ 14} Officers from the crime-scene unit photographed and documented the scene in the apartment and collected evidence. From the master bedroom, officers collected the knife that fell out of Montgomery's neck, a bleach bottle that appeared to have blood on it, and a pair of men's pants with apparent blood stains. The knife was over 12 inches long, the blade accounting for just over half the total length, and it was bloody and bent. Subsequent DNA testing confirmed that the blood present on the knife, the bleach bottle, and the pants collected from the bedroom matched Montgomery. Croom opined that the presence of Montgomery's blood on the knife blade indicated that he had injured his hands when they slipped down the blade while he was stabbing and cutting the victims.

{¶ 15} Croom testified that crime-scene-unit officers also observed near the entrance to the apartment a pair of men's shoes that appeared to have blood on them. They also noted a bloody shoeprint nearby. Officers collected a blood swab from the top of a space heater found near the entrance to Tahlia's bedroom and a blood swab from the hallway wall just outside her bedroom. Results of DNA testing done on both blood swabs indicated that they were a match to Tia.

{¶ 16} Officers also collected evidence from Tia's car, which was found in a parking lot in front of a different building in the apartment complex. Family members told police that Tia usually parked her car near her own building. During a canvass of the area, officers spoke to a female witness, identified only as "Ms. Battle," who told them that on Thanksgiving evening, she saw a black male exit the vehicle and proceed "southbound and then westbound behind her apartment, which was 425 Broadmeadows." Ms. Battle was unable to identify Montgomery as the person she saw get out of the car. Blood swabs collected from the steering wheel and gear shift knob of Tia's car matched Montgomery.

### B.     Verdict and Sentencing

**{¶ 17}** On May 8, 2012, the panel returned guilty verdicts as to all counts and specifications in the indictment.  The panel proceeded immediately to hold a mitigation hearing, at which the state reintroduced its evidence from the plea hearing.  Montgomery presented seven witnesses and made an unsworn statement.

**{¶ 18}** Following the mitigation hearing, the panel merged the two aggravated murder convictions regarding Tahlia (Counts 2 and 3), merged the two aggravated murder convictions regarding Tyron (Counts 4 and 5), and merged the domestic-violence conviction (Count 6) with the murder conviction regarding Tia (Count 1).

**{¶ 19}** As to both aggravated-murder convictions, the panel determined that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt and sentenced Montgomery to death.  The panel further ordered Montgomery to serve a sentence of 15 years to life in prison for Tia's murder.

**{¶ 20}** Montgomery now appeals his convictions and sentences, raising seven propositions of law.  For clarity, we address Montgomery's propositions out of order.

### II.     ANALYSIS

### A.     Validity of Jury Waiver and Guilty Plea

**{¶ 21}** In proposition of law No. 2, Montgomery argues that both his jury waiver and guilty plea were not knowing, intelligent, and voluntary.  He contends that the colloquies surrounding those decisions were inadequate and that the trial court should have further inquired into his mental health and use of prescription medications before accepting his waiver and guilty plea.

### 1.  Jury Waiver

**{¶ 22}** A jury waiver must be voluntary, knowing, and intelligent.  *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 45.  "Waiver may not be presumed from a silent record."  *Id.*  A written jury waiver is "presumptively

voluntary, knowing, and intelligent." *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 37. Only a "plain showing that the defendant's waiver was not freely and intelligently made" will rebut that presumption. *Id.*, citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

### a. Factual Background

{¶ 23} At a hearing on May 7, 2012, defense counsel presented the trial court with Montgomery's signed jury waiver. In response to the court's questions, counsel affirmed that they had reviewed the waiver with him, informed him of his constitutional right to a jury trial, and explained that by waiving the right, he was electing to have his case heard by a panel of three judges, who would ultimately determine his guilt and, if necessary, the appropriate punishment. Defense counsel further affirmed that they had explained that death was a potential punishment if the panel of judges found him guilty of any of the "charges with the specifications." Finally, defense counsel affirmed that they believed Montgomery was mentally competent and that "he understands and knows what he's doing here today."

{¶ 24} The court then conducted a colloquy with Montgomery to ensure that his waiver was knowing, intelligent, and voluntary. In response to the court's questions, Montgomery stated that to his knowledge, he had never been found mentally ill or incompetent and that he was currently under the influence of two prescription medications, Thorazine and Risperdal, which had been prescribed for depression. Montgomery denied having been diagnosed with any other "mental issues."

{¶ 25} Montgomery acknowledged that he understood he had a constitutional right to have a jury hear his case and determine guilt and, if necessary, punishment. He affirmed that his counsel had explained that by waiving a jury, he was electing not to have 12 people determine his guilt but was electing instead to have a panel of three judges decide his guilt and, if necessary,

punishment. And he affirmed that no one had promised him anything or threatened him in any way to cause him to want to waive his right to a jury trial. The court asked, "Do you in fact today waive your right to trial by jury and elect to have this matter heard by a panel of three judges?" Montgomery answered, "Yes, sir."

**{¶ 26}** Montgomery's signed jury waiver was journalized on the trial court's docket and is in the record on appeal. The written waiver contains the following acknowledgment: "I fully understand that under the laws of this State, I have a Constitutional right to a trial by jury. I wish to give up my right to a trial by jury in this case."

**{¶ 27}** Based on the waiver colloquy and the signed waiver form, the trial court determined that Montgomery had knowingly, intelligently, and voluntarily waived his right to a trial by jury.

### b. Analysis

**{¶ 28}** We have long held that "[t]he Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel." *State v. Jells*, 53 Ohio St.3d 22, 26, 559 N.E.2d 464 (1990). A jury waiver is knowing, intelligent, and voluntary " 'if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it.' " (Emphasis sic.) *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 69, quoting *United States v. Ruiz*, 536 U.S. 622, 629, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002).

**{¶ 29}** Nothing in the record supports Montgomery's contention that his jury waiver was not knowing, intelligent, and voluntary. Before the trial court accepted his waiver, Montgomery affirmed that he was making the decision freely and that he understood that he was relinquishing a constitutional right to a jury trial in favor of having a three-judge panel determine guilt and, if necessary,

punishment. He acknowledged his awareness that if he were found guilty, the punishment could be death. He also confirmed that his attorneys had discussed with him the jury-trial right and the option to waive it, and his counsel declared their belief that he was competent to waive the right and that he understood the consequences of a waiver.

**{¶ 30}** Without more, the fact that Montgomery was on prescription medications for depression does not defeat the presumption that his written waiver was knowing, intelligent, and voluntary. Montgomery does not allege that he, in fact, failed to understand the waiver proceedings or the effect of his decision to waive—or that his decision was somehow involuntary—because of the prescription medications. Instead, he asserts that "[a]n expert opinion on the effects of the medications * * * was necessary, especially given that he was giving up critical rights and facing the death penalty * * *." But Montgomery offers no authority for his assertion, and the burden of demonstrating error in the waiver proceedings is on him. *See Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, at ¶ 41, citing *Adams*, 317 U.S. 269, 63 S.Ct 236, 87 L.Ed. 268. Montgomery also argues that his waiver was not knowing and intelligent because the trial court did not specifically inform him that the death penalty could not be imposed should one juror vote against it. We have previously rejected the claim that a trial court must, during a jury-waiver colloquy, inform the defendant of the need for juror unanimity to impose death. *State v. Bays*, 87 Ohio St.3d 15, 19-21, 716 N.E.2d 1126 (1999).

**{¶ 31}** Montgomery's complaint that his waiver is invalid because the trial court failed to inform him that "it would only take one of the twelve jurors voting against conviction for him to be found not guilty" is likewise based on a faulty premise. Under Crim.R. 31(A), unanimity is required when the jury returns either a guilty or a not-guilty verdict. The trial court would have erred had it informed Montgomery that the lack of a unanimous verdict would have resulted in an acquittal.

**{¶ 32}** Finally, he argues that the court failed to inform him that a jury waiver would result in a waiver of certain claims on appeal. However, " '[s]ince * * * no inquiry is required, the trial court's failure to make specific inquiries of the defendant cannot be error.' " *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 70, quoting *State v. Filiaggi*, 86 Ohio St.3d 230, 238, 714 N.E.2d 867 (1999). Moreover, we are "aware of no Supreme Court precedent * * * that conditions the validity of a jury waiver upon a defendant's understanding of the appellate process." *Filiaggi v. Bagley*, 445 F.3d 851, 856 (6th Cir.2006).

**{¶ 33}** Montgomery has not made a plain showing that his written jury waiver was unknowing, unintelligent or involuntary.

## 2. Guilty Plea

**{¶ 34}** Montgomery also contends that the trial court failed to adequately inquire into his mental state and whether his prescription medications had any effect on his ability to enter a knowing, intelligent, and voluntary guilty plea. He maintains that once the trial court was aware that he was taking prescription medications for depression at the time of his plea, it should have ordered a competency evaluation. We disagree.

### a. Factual Background

**{¶ 35}** Shortly after he waived his right to a jury, a three-judge panel assembled and Montgomery pleaded guilty to all counts and specifications in the indictment. At the start of the plea hearing, the assistant prosecutor presented the panel with a written plea form signed by Montgomery and all counsel. The assistant prosecutor also informed the panel that there was no jointly recommended sentence.

**{¶ 36}** In response to the panel's questions, defense counsel affirmed that they had discussed the matter with Montgomery, that they approved of the written plea form, and that they approved of his entering a guilty plea in the case. The panel then asked defense counsel, "At this time do you believe Mr. Montgomery to

be mentally competent and do you believe he understands and knows what he's doing here today?" Defense counsel replied, "Yes, Your Honor."

{¶ 37} The following exchange then took place:

JUDGE REECE: Mr. Montgomery, before the Court can accept your plea, sir, we must first advise you of your rights and ask you some questions so we can determine whether your plea is being made voluntarily, knowingly, and with understanding.

* * *

JUDGE REECE: [H]ave you ever been found to be mentally ill or mentally incompetent?

THE DEFENDANT: No, sir.

JUDGE REECE: Are you currently under the influence of drugs?

THE DEFENDANT: Just Risperdal and Thorazine.

JUDGE REECE: Alcohol?

THE DEFENDANT: No, sir.

JUDGE REECE: And the prescription drugs, I asked you about that a little earlier this morning, those are prescribed by a medical doctor?

THE DEFENDANT: Yes, sir.

JUDGE REECE: And you are taking those pursuant to that prescription?

THE DEFENDANT: Yes, sir.

JUDGE REECE: My understanding is you are taking that for depression, correct?

THE DEFENDANT: Yes, sir.

JUDGE REECE:        Sir, as you appear here today, do you understand that you have a right to have a trial in this matter and to have the trial—these three judges to determine whether or not you are guilty of the offense that you are charged with here today?

THE DEFENDANT:  Yes, sir, I understand.

JUDGE REECE:        And my understanding is that you want to give up that right to a trial and to enter a plea of guilty to the charges in this case; is that correct?

THE DEFENDANT:  Yes, Your Honor.

{¶ 38} The panel also advised Montgomery of the charges in the indictment, of the maximum penalties those charges carried, and of each of the constitutional rights that would be waived upon entry of his guilty plea. After each discrete explanation, Montgomery said that he understood.

{¶ 39} Montgomery also affirmed that his plea was voluntary and that no one had promised him anything in return for his plea or threatened him in order to induce his plea. Finally, he acknowledged that his attorneys had reviewed the written plea form with him before he signed it, had been "diligent and effective" in representing him and in trying to act in his best interests, had informed him of his options, and had allowed him to make the decision as to whether to plead guilty or go to trial.

### b. Sufficiency of Inquiry into Mental State

{¶ 40} A guilty plea that is not knowing, intelligent, and voluntary violates the Ohio and United States Constitutions. *State v. Engle*, 74 Ohio St.3d 525, 527, 660 N.E.2d 450 (1996), citing *Kercheval v. United States*, 274 U.S. 220, 223, 47 S.Ct. 582, 71 L.Ed. 1009 (1927). It is the trial court's duty, therefore, to ensure that a defendant "has a full understanding of what the plea connotes and of its

consequence." *Boykin v. Alabama*, 395 U.S. 238, 244, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

{¶ 41} To effectuate this constitutional mandate, we have held that before accepting a guilty plea, a "trial court must inform the defendant that he is waiving his privilege against compulsory self-incrimination, his right to jury trial, his right to confront his accusers, and his right of compulsory process of witnesses." *State v. Ballard*, 66 Ohio St.2d 473, 423 N.E.2d 115 (1981), paragraph one of the syllabus, following *Boykin*; *see also* Crim.R. 11(C)(2)(c). In addition to these constitutional rights, the trial court must determine that the defendant understands the nature of the charge, the maximum penalty involved, and the effect of the plea. Crim.R. 11(C)(2)(a) and (b).

{¶ 42} A plea may be involuntary if "the accused does not understand the nature of the constitutional protections he is waiving * * * or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt." *Henderson v. Morgan*, 426 U.S. 637, 645, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976), fn. 13. Thus, "a plea does not qualify as intelligent unless a criminal defendant first receives 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.' " *Bousley v. United States*, 523 U.S. 614, 618, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998), quoting *Smith v. O'Grady*, 312 U.S. 329, 334, 61 S.Ct. 572, 85 L.Ed. 859 (1941).

{¶ 43} We have acknowledged that where a trial court engages in a full Crim.R. 11 plea colloquy with the defendant and addresses all of the constitutional rights waived by the plea, a "reviewing court should be permitted to consider additional record evidence to reconcile any alleged ambiguity [in the colloquy]." *State v. Barker*, 129 Ohio St.3d 472, 2011-Ohio-4130, 953 N.E.2d 826, ¶ 24. Accordingly, to determine whether the panel's plea colloquy with Montgomery was sufficient to ensure that he entered a voluntary and knowing plea, we examine the

totality of the circumstances. *See Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, at ¶ 56, citing *Henderson* at 644 and *State v. Rainey*, 3 Ohio App.3d 441, 442, 446 N.E.2d 188 (10th Dist.1982).

{¶ 44} In this case, the panel fully complied with *Ballard* and Crim.R. 11(C)(2), conducting a thorough colloquy with Montgomery and his counsel to ensure that he understood the proceedings and was capable of entering his guilty plea knowingly, intelligently, and voluntarily. But Montgomery contends that the panel's inquiry into the effect, if any, that his prescription medication had on his mental state was inadequate under *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064. Examining the totality of the circumstances, we do not find, as Montgomery contends, that the three-judge panel inadequately inquired into what effect, if any, his prescription medication had on his mental state.

{¶ 45} In *Mink*, we stated that "[a]dditional inquiry is necessary into a defendant's mental state once a defendant seeking to enter a guilty plea has stated that he is under the influence of drugs or medication." *Id.* at ¶ 66. And applying that standard, we upheld Mink's guilty plea and rejected his argument that the trial court inadequately questioned him about any potential effects that his antidepressant medication had on his competency to plead guilty. *Id.* at ¶ 68.

{¶ 46} We noted that before he entered his plea, Mink underwent two competency evaluations, each resulting in a finding that Mink was competent. *Id.* at ¶ 32, 64. One of the two competency reports reflected the psychologist's awareness that Mink was taking an antidepressant, yet that fact did not alter the psychologist's conclusion that he was competent to plead guilty. *Id.* at ¶ 64. In addition, during the plea colloquy, Mink confirmed that his prescription medications did not interfere with his ability to understand the proceedings. *Id.*

{¶ 47} We hold that the panel in this case complied with *Mink*. The panel had no reason to believe that Montgomery had any issues with competence or could not intelligently and voluntarily enter a guilty plea. Throughout the nearly 18

months preceding Montgomery's guilty plea, the presiding judge repeatedly observed Montgomery and spoke with him and his two defense attorneys. Prior to the plea hearing, Montgomery appeared multiple times before the presiding judge, including at the jury waiver hearing, and neither he nor his counsel ever made any representation to the court that he had any mental-health issues or any issues with competency.

{¶ 48} Indeed, Montgomery even now presents us with no reason to believe that he was incapable of intelligently and voluntarily pleading guilty. Rather, he merely alleges that the panel did not ask enough questions about his prescription medication at the time of the plea.

{¶ 49} But the record demonstrates that the presiding judge learned that Montgomery was taking two medications prescribed for mental illness at the jury-waiver hearing and that in that colloquy, the judge asked whether he had been prescribed the medications and whether he was taking them pursuant to the prescription. As described above, after learning that Montgomery was taking the medications, the presiding judge directly asked him whether he understood the constitutional rights he was forgoing by waiving his right to a jury, whether he was doing so voluntarily, and whether his counsel had reviewed the jury waiver with him prior to the hearing.

{¶ 50} Likewise, at the plea hearing, the presiding judge revisited the subject of Montgomery's prescription medications for the benefit of the other judges composing the three-judge panel. And only after Montgomery reaffirmed that he was taking medications pursuant to a doctor's prescription did the panel conduct the full plea colloquy in compliance with Crim.R. 11. The panel asked Montgomery whether he understood the charges against him, the constitutional rights he was waiving by pleading guilty, the consequences of his guilty plea, and the maximum sentence he could potentially receive if found guilty of the capital specifications. The panel then verified that he understood the written plea

agreement and had executed it with the advice of his counsel. Montgomery answered each of the panel's questions in the affirmative and in a coherent fashion.

{¶ 51} The panel also directly addressed Montgomery's lawyers and asked whether they had any reason to believe that he was not competent or capable of voluntarily and intelligently pleading guilty. Defense counsel, both of whom were experienced and certified capital defense attorneys, were aware that Montgomery was medicated for depression, yet they had no concerns about his competence. *See Blackledge v. Allison*, 431 U.S. 63, 73-74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (noting that the representations of the defendant's lawyers at a Rule 11 hearing constitute a formidable barrier in a subsequent challenge to the defendant's competency). The record demonstrates that defense counsel never raised an issue to the court about Montgomery's ability to understand the proceedings and enter a knowing and voluntary guilty plea.

{¶ 52} In short, there is no evidence in the record to indicate that Montgomery was not in full possession of his faculties at the plea hearing or at any other point during the pendency of his case. Under these circumstances and considering the totality of the evidence, we find that the panel's inquiry into Montgomery's mental state and use of prescription medications and in its acceptance of Montgomery's guilty plea was adequate and that Montgomery voluntarily and knowingly pleaded guilty to capital murder.

### c. Failure to Sua Sponte Order Competency Hearing

{¶ 53} Montgomery argues that the panel's failure to sua sponte order a competency hearing upon learning that he was taking prescription medication at the time of the plea renders his plea invalid. In this proposition, Montgomery does not contend that he was legally incompetent as a result of the prescription medications that he was taking or that his medications caused him to unknowingly and unintelligently enter his guilty plea. Instead, he contends that the panel's reliance on defense counsel's assessment of Montgomery's competence and on its own

16

observations of Montgomery throughout the proceedings was insufficient. In support, he invokes *Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, and *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, and contends that our decisions in those cases establish that a competency evaluation must be ordered by the court when a capital defendant is taking prescription medication and enters a guilty plea.

**{¶ 54}** As Montgomery observes, competency evaluations were conducted in *Mink* and *Ketterer* before each defendant entered his guilty plea to capital charges. *See Mink* at ¶ 31-32; *Ketterer* at ¶ 67. But we have never held that a court *must* order a competency hearing before accepting a guilty plea from a capital defendant who is taking a prescription medication for mental illness, and we decline to do so now.

**{¶ 55}** "R.C. 2945.37(G) creates a rebuttable presumption that a defendant is competent to stand trial." *State v. Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 56. A trial court must hold a competency hearing if a request is made before trial, R.C. 2945.37(B), or if the record contains sufficient indicia of incompetence that an inquiry is necessary to ensure that the defendant is accorded his right to due process and a fair trial. *State v. Were*, 94 Ohio St.3d 173, 175, 761 N.E.2d 591 (2002), citing *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995).

**{¶ 56}** The constitutional standard for assessing a defendant's competency to enter a guilty plea is the same as that for determining his competency to stand trial. *Godinez v. Moran*, 509 U.S. 389, 396, 398-399, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). The defendant must have a " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and [have] 'a rational as well as factual understanding of the proceedings against him.' " *Id.* at 396, quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Further, "[i]n addition to determining that a defendant who seeks to plead

guilty * * * is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Id.* at 400. And it is a matter of statutory and decisional law that "[t]he fact that a defendant is taking antidepressant medication or prescribed psychotropic drugs does not negate his competence to stand trial." *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 71; *see also Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, at ¶ 38, citing R.C. 2945.37(F).

{¶ 57} Here, no request was made to evaluate Montgomery's competency before or during the plea hearing. Likewise, the record does not indicate that Montgomery failed to understand the proceedings or was incapable of consulting with his counsel " 'with a reasonable degree of rational understanding.' " *Godinez* at 396, quoting *Dusky* at 402. During the plea colloquy, Montgomery appropriately answered the court's questions and, when asked by the court, affirmed that defense counsel had discussed with him the options of a trial and a plea and provided him with the necessary information to allow him to make an informed decision to plead guilty.

{¶ 58} Additionally, defense counsel, who were appointed to represent Montgomery in January 2011, retained forensic psychologist Dr. Bob Stinson more than a year before Montgomery's plea hearing. Billing records demonstrate that Dr. Stinson spent many hours reviewing Montgomery's records, conducted five separate in-person evaluations with him, met with the defense team several times, and prepared a report. Since defense counsel retained an expert to evaluate Montgomery's mental health, presumably counsel had access, at the time of the plea, to information regarding his mental health and/or alleged incompetence. However, counsel offered no such evidence. Additionally, the fact that defense counsel retained Dr. Stinson more than a year before the plea hearing and, in that span of time, met with Montgomery on several occasions indicates that counsel's

response to the panel's query about Montgomery's competence was not uninformed, as Montgomery now implies.

{¶ 59} Finally, Montgomery's behavior throughout the plea colloquy and hearing was not outrageous, irrational or confused. *See State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 63 (noting that during the time that counsel represented Williams, "counsel discovered no basis to question [his] competence. Moreover, Williams displayed no outrageous, irrational behavior during trial, and counsel never complained about his lack of cooperation"). We have previously found it " 'noteworthy that *nobody* on the spot thought [the defendant's] behavior raised any question as to his competence.' " (Emphasis sic.) *Id.*, quoting *State v. Cowans*, 87 Ohio St.3d 68, 84, 717 N.E.2d 298 (1999).

{¶ 60} The three-judge panel did not err by failing to sua sponte order Montgomery to undergo a competency evaluation.

### B. Sufficiency of the Evidence and Manifest Weight

{¶ 61} In proposition of law No. 1, Montgomery argues that the evidence presented during the plea hearing was insufficient to convict him of the escaping-detection specification attached to Counts 2 and 3 (aggravated murder of Tahlia). Montgomery also contends that his conviction of that specification is against the manifest weight of the evidence.

### 1. Applicability of Sufficiency Constitutional Standard

{¶ 62} As a threshold matter, the state advances several unconvincing arguments supporting its contention that it was not required to provide sufficient evidence of the capital specifications in light of Montgomery's guilty plea.

{¶ 63} Quoting *Smith v. McCotter*, 786 F.2d 697 (5th Cir.1986), the state asserts that the constitutional sufficiency standard "is 'inapplicable to convictions based on a guilty plea,' " because the plea operates as a complete admission of factual guilt.

**{¶ 64}** A guilty plea is a complete admission of factual guilt, Crim.R. 11(B)(1), and ordinarily bars a defendant from asserting on appeal any constitutional error that preceded the guilty plea, *see Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, at ¶ 78. However, we have held that "when the offense charged is a capital offense, R.C. 2945.06 and Crim.R. 11(C)(3) require the state to prove guilt of an aggravated-murder charge with death specifications even when an accused pleads guilty." *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 93. Therefore, sufficiency challenges on appeal are " 'expressly permitted' " when a defendant pleads guilty to aggravated murder with capital specifications. *Id.*, quoting *Carpenter v. Mohr*, 163 F.3d 938, 946 (6th Cir.1998), *rev'd on other grounds, sub nom. Edwards v. Carpenter*, 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).

**{¶ 65}** Second, the state argues that neither R.C. 2945.06 nor Crim.R. 11(C)(3) requires that "independent proof be provided in support of the specifications." Those provisions, according to the state, "are directed toward the question * * * whether the defendant is guilty of aggravated murder or some lesser *offense*." (Emphasis sic.) Thus, the state concludes that R.C. 2945.06 and Crim.R. 11(C)(3) do not apply to the capital specifications contained in R.C. 2929.04(A).

**{¶ 66}** The state also contends that if this court interprets Crim.R. 11(C)(3) "to require an examination of witnesses as to a capital specification, it would be unconstitutional" under Article IV, Section 5(B) of the Ohio Constitution. Finally, the state contends that *Ketterer* should be overruled to the extent that it extended to capital specifications the syllabus law of *State v. Green*, 81 Ohio St.3d 100, 104, 689 N.E.2d 556 (1998), which held that "[w]hen a defendant pleads guilty to aggravated murder in a capital case, a three-judge panel is required to examine witnesses and to hear any other evidence properly presented by the prosecution in order to make a Crim.R. 11 determination as to the guilt of the defendant." We reject all of the state's arguments in this vein and decline to overrule *Ketterer*.

20

**{¶ 67}** The state relies heavily on our decision in *State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, 945 N.E.2d 498, to support its argument. *Ford* involved the question whether a firearm specification could be an allied offense of similar import under R.C. 2941.25 and therefore capable of being merged with the predicate offense. *Id*. at ¶ 1. Answering that question in the negative, we held that "[t]he criminal offense of discharging a firearm at or into a habitation as defined in R.C. 2923.161 and a firearm specification as defined in R.C. 2941.145 are not allied offenses of similar import as defined in R.C. 2941.25, because a firearm specification is a penalty enhancement, not a criminal offense." *Id*. at paragraph one of the syllabus.

**{¶ 68}** The state focuses on language in *Ford* indicating that the firearm specification is "not a separate criminal offense" because it is "merely a sentencing provision that requires an enhanced penalty upon certain findings." *Id*. at ¶ 16-17. The state concludes that because the aggravating circumstances enumerated in R.C. 2929.04(A) are contingent upon proof of the predicate offense of aggravated murder, "it becomes plain that, when R.C. 2945.06 refers to having an examination of witnesses to 'determine whether the accused is guilty of aggravated murder or some other offense,' the provision is directed solely toward proof of the 'offense,' i.e., aggravated murder, not toward the accompanying specification(s)." We disagree.

**{¶ 69}** First, *Ford* was not a capital case; thus, in that opinion, we did not address whether a capital specification must be supported by legally sufficient evidence. More importantly, R.C. 2929.04(A) states, "Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt." The firearm-specification statute at issue in *Ford* contains no similar language requiring that it be proven beyond a reasonable doubt. *Compare* R.C. 2941.145.

{¶ 70} "We have consistently required strict compliance with Ohio statutes when reviewing the procedures in capital cases." *Filiaggi*, 86 Ohio St.3d at 240, 714 N.E.2d 867. R.C. 2929.04(A) unambiguously states that the capital specifications must be proven beyond a reasonable doubt. And R.C. 2945.06 provides, "The court shall follow the procedures contained in sections 2929.03 and 2929.04 of the Revised Code in all cases in which the accused is charged with an offense punishable by death." Accordingly, when read together, R.C. 2945.06 and R.C. 2929.04(A) mandate that the offense of aggravated murder, including any attached capital specifications, must be proven beyond a reasonable doubt.

{¶ 71} We also reject the state's suggestion that Crim.R. 11(C)(3) would be unconstitutional if "interpreted to require an examination of witnesses." The state's argument hinges on its assertion that Crim.R. 11(C)(3) contains no "requirement that independent proof be provided in support of the specifications" and that requiring sufficient proof to support the capital specifications would "be an improper substantive expansion of [Crim.R. 11(C)(3)] beyond what the statutory law provides." In its view, requiring the state to provide evidence to support the finding of guilt on a capital specification where a defendant enters a guilty plea would equate to giving Crim.R. 11 "substantive effect" in violation of Article IV, Section 5(B) of the Ohio Constitution. We disagree.

{¶ 72} The interplay between procedural rules and the provisions of the Revised Code that apply to capital cases makes clear that when a defendant pleads guilty to an indictment containing capital specifications, Crim.R. 11(C)(3), R.C. 2945.06, and R.C. 2929.04 work together to require sufficient proof of the offense of aggravated murder as well as the capital specifications attached to that offense. R.C. 2929.04(A) specifically requires that capital specifications be proven beyond a reasonable doubt, and R.C. 2945.06 directs trial courts to "follow the procedures contained in sections 2929.03 and 2929.04 of the Revised Code in all cases in which the accused is charged with an offense punishable by death." Accordingly, R.C.

2945.06 and R.C. 2929.04(A) together prescribe the procedures required when a defendant pleads guilty or no contest to a capital indictment. And this court has specifically held that there is "no conflict in the procedural requirements of Crim.R. 11 and R.C. 2945.06." *Green*, 81 Ohio St.3d at 104, 689 N.E.2d 556. Accordingly, we hold that construing Crim.R. 11(C)(3) and R.C. 2945.06 and 2929.04(A) together is appropriate and does not result in any conflict.

{¶ 73} Thus, in a capital case, the aggravating circumstances codified in R.C. 2929.04(A) require the production of evidence sufficient to prove their existence beyond a reasonable doubt. We reject the state's argument that it had no duty to prove the capital specifications due to Montgomery's guilty plea.

## 2. Applicable Legal Standards

{¶ 74} A challenge to the sufficiency of the evidence supporting a conviction requires that we consider "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.' " *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 94, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).

{¶ 75} In contrast, a manifest-weight challenge "concerns 'the inclination of the *greater amount of credible evidence * * ** to support one side of the issue rather than the other.' " (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). A manifest-weight challenge requires us to consider the entire record, including the credibility of the witnesses, the weight of the evidence, and any reasonable inferences and determine whether " 'the [panel] clearly lost its way and created

such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id*., quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *accord* R.C. 2953.02.

### 3. Analysis

{¶ 76} Montgomery argues that the evidence was legally insufficient to support his guilt on the escaping-detection specification because the state "presented no evidence that the death of Tia occurred first in time or that Tahlia's death was a means to escape detection, apprehension, trial, or punishment." The state counters by arguing, first, that the language of the escaping-detection specification in the indictment alleged only that Montgomery killed Tahlia to escape detection for "murder," generally; in other words, the specification's language did not require proof that he killed Tahlia to escape detection for Tia's murder. The state also argues that "nothing in the specification required that the State prove that Tia's (or Tyron's) murder preceded the killing of Tahlia."

{¶ 77} The evidence adduced at the plea hearing did not directly establish the order in which Montgomery murdered the three victims. However, we have held that "where the accused attempts to kill the *only* witness to his commission of a crime, there exists sufficient circumstantial evidence that the act was undertaken for the purpose of avoiding detection." (Emphasis added.) *State v. Wiles*, 59 Ohio St.3d 71, 85, 571 N.E.2d 97 (1991). Thus, because Montgomery murdered all three individuals present in the apartment, we find that any rational trier of fact could reasonably conclude that he murdered Tahlia for the purpose of escaping detection for the other murders.

{¶ 78} In conclusion, viewing the evidence in the light most favorable to the state, we find that there was sufficient evidence to convict Montgomery of murdering Tahlia for the purpose of escaping detection for either of the other two murders.

{¶ 79} We also reject Montgomery's claim that his conviction for this specification was against the manifest weight of the evidence. Montgomery presented no evidence during the plea hearing and declined to cross-examine Detective Croom. A review of the entire record reveals no inconsistencies or other conflicts in the evidence that indicate to us a lack of credibility of the sole witness. Accordingly, Montgomery has not shown that "a miscarriage of justice" occurred or that the panel "lost its way" when it found him guilty of the R.C. 2929.04(A)(3) specification attached to Counts 2 and 3.

{¶ 80} We reject proposition of law No. 1.

### C. Ineffective Assistance of Counsel

{¶ 81} In proposition of law No. 3, Montgomery argues that defense counsel provided ineffective assistance during the plea and mitigation hearings. He further contends that the "cumulative effect" of counsel's errors and omissions resulted in the denial of his Sixth Amendment right to the effective assistance of counsel.

{¶ 82} To assess Montgomery's ineffective-assistance claim, we must engage in a two-part inquiry. Montgomery must show both that his counsel performed deficiently during the trial-court proceedings and that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). With regard to the performance prong, he must show that counsel's representation "fell below an objective standard of reasonableness." *Id*. at 688. To show prejudice, he must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. The prejudice inquiry, thus, focuses not only on outcome determination, but also on "whether the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

### 1. Failure to Object to Inadmissible Testimony

**{¶ 83}** Montgomery initially contends that defense counsel provided ineffective representation when they failed to object to portions of Detective Croom's testimony on hearsay and confrontation grounds.

**{¶ 84}** Montgomery's argument must be evaluated in the context of R.C. 2945.06, which requires a three-judge panel to conduct an evidentiary hearing to establish a defendant's guilt beyond a reasonable doubt when a defendant pleads guilty to capital murder. We have interpreted R.C. 2945.06 to require "a three-judge panel * * * to examine witnesses and to hear any other evidence properly presented by the prosecution in order to make a Crim.R. 11 determination as to the guilt of the defendant." *Green*, 81 Ohio St.3d at 104-105, 689 N.E.2d 556.

**{¶ 85}** During the plea hearing, defense counsel objected to every photograph as gruesome and cumulative, but specifically informed the court that they did not object to the three autopsy reports. Defense counsel did not object to Croom's testimony about the autopsy reports or to his testimony about what witnesses said during the investigation.

**{¶ 86}** A defendant alleging ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674. Montgomery specifically challenges, on both confrontation and hearsay grounds, counsel's failure to object to Croom's testimony about "conversations with Fred Taylor" and "statements from family members who were concerned that Tia had not arrived as expected on Thanksgiving and that her car was parked in an unfamiliar location," as well as Croom's testimony about Ms. Battle's statements regarding what she witnessed on Thanksgiving evening. He also argues that defense counsel were ineffective for failing to object on confrontation and hearsay grounds to Croom's testimony about the autopsies.

### a. Testimony about Witness and Family-Member Statements

{¶ 87} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the * * * hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 802 generally prohibits the introduction of hearsay unless the evidence falls under a specific exception to the hearsay prohibition. And only testimonial hearsay implicates the Confrontation Clause, which provides a criminal defendant with the right to be confronted with any witness against him. *Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). "[T]estimonial statements are those made for 'a primary purpose of creating an out-of-court substitute for trial testimony.' " *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 40, quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).

{¶ 88} However, a law enforcement officer can testify about a declarant's out-of-court statement for the nonhearsay purpose of explaining his or her next investigative step. *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980). Testimony offered to explain police conduct is admissible as nonhearsay only if it satisfies three criteria: (1) "the conduct to be explained [is] relevant, equivocal, and contemporaneous with the statements," (2) the probative value of the statements is not substantially outweighed by the danger of unfair prejudice, and (3) "the statements [do not] connect the accused with the crime charged." *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27. If these conditions are met, the testimony does not implicate the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), fn. 9.

{¶ 89} Croom's testimony about Tia's family members' and coworkers' concern about her absence was not inadmissible hearsay, and defense counsel were not ineffective for failing to object. Croom offered the statements to explain how police came to investigate the case. Croom's testimony regarding what Tia's family

told another detective about the location of Tia's parked car was also offered to describe how officers found Tia's car. This testimony was relevant, equivocal, and did not identify Montgomery as the perpetrator, and the danger of unfair prejudice did not substantially outweigh the probative value of this testimony. Accordingly, any objection by defense counsel to this testimony would not have been sustained, and counsel were not ineffective for failing to object.

{¶ 90} Croom's testimony about what the witness identified as Ms. Battle told officers (that she saw a man exit Tia's vehicle on Thanksgiving evening) arguably violated *Ricks* because it went beyond the nonhearsay purpose of explaining how officers came to locate Tia's car. Ms. Battle's statements provided officers with an evidentiary link to Montgomery as the perpetrator, and she offered those statements in the course of a police canvass designed to elicit information "to establish or prove past events potentially relevant to later criminal prosecution," *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. However, because Ms. Battle's statements were offered in a proceeding before a three-judge panel, any error in admitting Ms. Battle's statements was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The evidence of Montgomery's guilt was overwhelming, and we apply the presumption that the three-judge panel knew the law and considered only competent, relevant evidence in its deliberations. *See State v. Davis*, 63 Ohio St.3d 44, 48, 584 N.E.2d 1192 (1992) ("Judges, unlike juries, are presumed to know the law. Judges are trained and expected to disregard any extraneous influences in deliberations"). Accordingly, we conclude that defense counsel were not ineffective for failing to object to Croom's testimony about what Ms. Battle said to officers during the investigation.

{¶ 91} Croom's testimony regarding Taylor's statements about his relationship to Tia and Tia's activities the night before her murder was arguably offered to explain the subsequent investigative steps taken in this case. Taylor's

28

statements provided police with information about Tia's last known whereabouts and allowed police to investigate Taylor's role, if any, in the homicides. This testimony established that Taylor was not a suspect, and "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 92} Taylor's statements did not inculpate Montgomery and were not prejudicial to him. Any objection by defense counsel to this testimony would likely have been overruled. Therefore, counsel's decision not to object was reasonable trial strategy.

### b. Testimony about the Autopsy Reports

{¶ 93} Montgomery also cannot establish ineffective assistance stemming from counsel's failure to object to the autopsy reports or to Croom's testimony about them. First, defense counsel's agreement to the admission of the three autopsy reports in this case was reasonable in light of this court's decision, four years before Montgomery's plea hearing, that "autopsy records are admissible as nontestimonial business records." *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 88; *accord Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 59 ("although autopsy reports are sometimes relevant in criminal prosecutions, *Craig* rightly held that they are not created primarily for a prosecutorial purpose").

{¶ 94} Second, counsel's failure to object to Croom's testimony about the contents of the autopsy reports did not fall below the objective standard of reasonableness applicable to ineffective-assistance claims. Montgomery does not dispute any of the coroner's findings or conclusions. And, as previously mentioned, the stipulation to admit the autopsy reports themselves occurred prior to Croom's testimony. Counsel could reasonably have determined that having Croom testify summarily about the autopsy reports would not prejudice Montgomery, because the

panel would be exposed to less detail about how each victim died than it would have been had Dr. An testified. *See State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 196 (counsel could have reasonably concluded that the defendant had nothing to gain from having the testimony that was given by a police "summary witness" be instead "presented by several witnesses rather than one").

**{¶ 95}** Montgomery also fails to carry his burden on the issue of prejudice. He does not allege any specific prejudice that befell him as a result of counsel's alleged ineffectiveness, contending merely that Croom's testimony about the autopsy reports "was in violation of *Crawford* * * * and trial counsel were ineffective for failing to object." Montgomery's argument is conclusory, and he has not even attempted to show prejudice under *Strickland*.

### 2. Failure to Seek a Plea Agreement for a Sentence other than Death

**{¶ 96}** Montgomery also argues that defense counsel were ineffective for advising him to plead guilty to the indictment without securing an agreement from the state not to pursue the death penalty. In response, the state asserts that the record fails to demonstrate whether any plea negotiations occurred and what defense counsel's advice to Montgomery was.

**{¶ 97}** Initially, Montgomery contends that "[t]he United States Supreme Court has determined that the [American Bar Association ("ABA")] Guidelines [for the Appointment and Performance of Counsel in Death Penalty Cases] provide the standards to be used in evaluating counsel's effectiveness in a capital case." He notes that the ABA Guidelines caution that "[i]f no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights." *See* ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* Section 10.9.2, Commentary (Rev.Ed. 2003), reprinted in 31 Hofstra L.Rev. 913, 1045 (2003).

**{¶ 98}** The United States Supreme Court has "explicitly approved" using the ABA Guidelines "on attorney performance in effect at the time of a defendant's trial as 'guides to determining what is reasonable' performance by counsel." *Hodges v. Colson*, 727 F.3d 517, 534-535 (6th Cir.2013), quoting *Padilla v. Kentucky*, 559 U.S. 356, 366, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). The court has also clarified that " '[ABA] standards and the like' are 'only guides' to what reasonableness means, not its definition." *Bobby v. Van Hook*, 558 U.S. 4, 8, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009), quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶ 99}** As to the application of those guidelines here, the record before us does not disclose whether Montgomery was offered a plea deal at any stage of the litigation. Defense counsel informed the court early in the proceedings that "the path that the case has taken already—the Court is aware that the intention is to enter [a] guilty plea and simply address the mitigation phase on this except for the facts * * *." But the record does not indicate whether defense counsel attempted to negotiate a plea deal with the state or whether plea negotiations ever occurred. Further, Montgomery's assertion that defense counsel advised him to plead guilty is not supported by the record. As noted previously, Montgomery affirmed in open court that, prior to entering his plea, defense counsel discussed with him the options between trying his case to a jury or entering a guilty plea to a panel of judges, and that pleading guilty was his own voluntary choice.

**{¶ 100}** Even if Montgomery could establish that defense counsel explicitly advised him to enter a guilty plea without a plea agreement, pleading guilty to capital charges without a guaranteed life sentence is not per se ineffective assistance. *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 82, 85. Per se ineffective assistance, a "narrow exception to *Strickland's* holding," *Florida v. Nixon*, 543 U.S. 175, 190, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), has been recognized only where "the attorney's failure [is] complete * * * [and]

'*entirely* fails to subject the prosecution's case to meaningful adversarial testing.' " (Emphasis sic.) *Bell v. Cone*, 535 U.S. 685, 697, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), quoting *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

{¶ 101} Montgomery's counsel did not fail to subject the state's case to adversarial testing by supporting their client's decision to plead guilty. Rather, counsel were "faced with the formidable task of defending a client who had committed a horribly brutal and senseless crime," *Bell* at 699, in murdering three people, including two young children. Indeed, defense counsel could have "reasonably believed that a guilty plea could minimize the effect of gruesome facts and a brutal murder, especially before a three-judge panel." *Ketterer* at ¶ 86.

{¶ 102} During the plea hearing, defense counsel routinely objected to the state's introduction of hundreds of photographs depicting the scene and the victims. Although the panel largely overruled defense counsel's objections, this demonstrates that, despite the guilty plea, defense counsel engaged in significant adversarial testing of the state's case. In addition, defense counsel mounted a mitigation case that included testimony not only from Montgomery's family members but also from two Franklin County Children's Services employees who had interacted with him when he was a teenager. And by pleading guilty, Montgomery "obtained the benefit of substantial mitigation evidence, namely remorse and a plea of guilty." *Id.*, citing *State v. Ashworth*, 85 Ohio St.3d 56, 72, 706 N.E.2d 1231 (1999) ("guilty pleas are traditionally accorded substantial weight in imposing a sentence").

{¶ 103} Finally, there was significant evidence of Montgomery's guilt: forensic evidence linked him to the murder weapon, to the victim's vehicle, and to an open bottle of bleach in the apartment. He had multiple cuts on the palms of his hands. And there was testimony that Montgomery and Tia had had a turbulent past and that at the time of her murder, she was involved with another man.

{¶ 104} "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Based on the record as a whole, we cannot conclude that defense counsel pursued an unreasonable strategy by focusing on mitigation. *See Nixon*, 543 U.S. at 191, 125 S.Ct. 551, 160 L.Ed.2d 565 (where the evidence of guilt is strong, defense counsel "may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared"). Moreover, Montgomery has not pointed to any evidence in the record to demonstrate that his decision to plead guilty was based on deficient advice by defense counsel or any evidence to show whether plea negotiations were ever pursued. Accordingly, Montgomery's argument under this branch of his ineffective-assistance claim is speculative and does not support a finding of ineffective assistance of counsel.

### 3. Failure to Seek Removal of a Panel Member

{¶ 105} Next, Montgomery complains that his counsel provided ineffective assistance when they failed to object to the continued participation of one of the panel members who allegedly appeared to be sleeping during the proceedings. Montgomery contends that his counsel should have requested an evidentiary hearing to question the individuals who made the allegations.

{¶ 106} The issue was first brought to the panel's attention after the conclusion of the mitigation hearing. In an inter partes hearing for which defense counsel waived Montgomery's right to be present, defense counsel stated that after the close of proceedings the previous week, "people both in the audience as well as members of the media" had informed them that it "appeared that Judge Sheward may have been asleep during part of the proceedings." Defense counsel further informed the panel:

[T]he people from the media—this is actually where the problem lies why I think we need to have a record of this—indicate there's some video footage that shows him with his eyes closed. I will say that I have been in [the judge's] courtroom before during proceedings when he is clearly paying attention at that phase.

But since it was brought to our attention I feel I need to ask the Presiding Judge to inquire as I would with a juror normally. And you know there's no disrespect but other people are already talking about it, it creates a problem for us down the road. And I think we want the record to try to remain clear.

{¶ 107} Before the presiding judge could inquire, Judge Sheward stated:

Well, I do all the time, and I'm sure I did in this case, many times sit with my head down concentrating on what's being said. I think the important thing is to listen, not necessarily to watch. But I can only assure you that I heard every word that was said.

And but that being said, I don't question that, you know, at some times when I'm concentrating on things my eyes are closed or my head may be down ruminating on what's going on. But by no means was I asleep. Jesus, I find that, I don't know, surprising or whatever. But no. I don't know what else to say.

{¶ 108} When asked by the presiding judge, defense counsel admitted that the allegations were not specific in terms of "how long or how significant it was." Defense counsel then stated, "[F]rankly, I'm more than satisfied with the answer. I just think with other people bringing it to our attention if we didn't ask for the inquiry to be made, I know exactly where this would be going."

34

**{¶ 109}** After the third panel member declined an opportunity to further inquire, defense counsel informed the panel that "based on [counsel's] experiences * * * that happens to be a habit of [the judge's]. * * * Not sleeping, closing his eyes. And I do know because he responds to things all the time. And when he's the only judge and there's an objection raised, he is there to respond to it." At this point, defense counsel reaffirmed that they were "satisfied with the response."

**{¶ 110}** Montgomery argues that it was unreasonable for his counsel to raise the issue regarding Judge Sheward but then not adequately explore it by requesting a hearing to develop the witness testimony and play the video footage. Viewing the video footage may have assisted defense counsel and the panel in determining whether the judge actually did close his eyes or was asleep and if so, for how long, at what stage of the proceedings this conduct occurred, and whether it appeared that the judge missed large or significant portions of testimony. *See State v. Sanders*, 92 Ohio St.3d 245, 253, 750 N.E.2d 90 (2001) (no plain error in failing to remove sleeping juror where no evidence that "the juror missed large or critical portions of the trial," and "trial judge was watching the situation, and he admonished the jury to be alert"). On the other hand, the video may have shown the judge's eyes closed, but as one court considering this issue noted, "that a person's eyes are closed does not necessarily mean that he or she is asleep." *People v. Degondea*, 3 A.D.3d 148, 163, 769 N.Y.S.2d 490 (2003). Moreover, when asked, Judge Sheward maintained that he had not fallen asleep during the proceedings and that he had "heard every word that was said," even if at times, when "concentrating on things," his eyes were closed or his head was down.

**{¶ 111}** Even assuming defense counsel's failure to request an opportunity to view the video footage qualifies as deficient performance, Montgomery's claim still fails in the absence of a reasonable probability that the result of the requested hearing would have changed the outcome of his case. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. Montgomery contends that had the video

footage or witness testimony proved that the judge had fallen asleep during the proceedings, it would have resulted in that judge's removal from the panel. However, Montgomery cites no authority for this proposition.

{¶ 112} To the contrary, if a sleeping juror has not missed "large or critical portions" of the proceedings, no prejudice results from that juror's remaining on the jury. *Sanders* at 253. Accordingly, Montgomery's claim that his counsel's continued objection would have resulted in the judge's removal is speculative and does not demonstrate prejudice under *Strickland*.

{¶ 113} We reject this aspect of his ineffective-assistance claim.

### 4. Failure to Present Expert Testimony during the Mitigation Hearing

{¶ 114} Montgomery further contends that defense counsel were ineffective in failing to call a psychologist and a "sex-abuse expert" as witnesses during the mitigation hearing. While acknowledging defense counsel's pretrial retention of both Dr. Bob Stinson, a forensic psychologist, and Dr. Howard Fradkin, a childhood-sexual-abuse expert, Montgomery maintains that "there is no evidence that trial counsel provided Dr. Fradkin with any records." According to Montgomery, defense counsel's decision not to call Drs. Stinson and Fradkin as mitigation witnesses was not a strategic decision made after an adequate investigation.

{¶ 115} " 'Defense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability, and family relationships.' " *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 219, quoting *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir.2011). And while "strategic choices made after thorough investigation of law and facts * * * are virtually unchallengeable[,] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the

limitations on investigation." *Strickland*, 466 U.S. at 690-691, 104 S.Ct. 2052, 80 L.Ed.2d 674. A reviewing court assessing the reasonableness of defense counsel's investigation "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

{¶ 116} Contrary to Montgomery's assertion, the record demonstrates that defense counsel conducted an extensive mitigation investigation. The trial court granted defense requests for funding—and, later, multiple requests for additional funding—for a mitigation expert, a psychologist, and an investigator on January 28, 2011, more than a year before Montgomery's plea hearing. And at a hearing a few months later, defense counsel informed the court:

> Dr. Stinson has been our psychiatrist or psychologist since the beginning of this case; and Kelly Heiby—who has been hired as a mitigation expert from the State Public Defender's Office since the beginning of this case—has been working diligently, have stayed in touch with us, have given us mounds and mounds of paperwork and records, have visited Caron regularly, and dealt with his family regularly, as we have also on many of those visits.

Later, defense counsel secured a continuance to allow Dr. Fradkin to personally meet with Montgomery.

{¶ 117} At the mitigation hearing, defense counsel called seven witnesses, including Montgomery's two adult sons, his younger brother, a first cousin, the first cousin's wife, and two former Franklin County Children's Services ("FCCS") employees who worked with Montgomery when he was a teenager. The defense mitigation strategy focused on Montgomery's chaotic and unstable childhood,

including inadequate parental support, sexual abuse, and placement into FCCS and Department of Rehabilitation and Corrections institutions. The defense also established that many of Montgomery's nonparental family members continue to love, support, and care for him. Montgomery also presented an unsworn statement in which he emphasized remorse for his hurtful and selfish murderous actions, his desire to continue to care for his other children, his lack of prior violence towards girlfriends, and his behavioral trouble as a young boy. He apologized to the Hendricks family and specifically to Tia's mother for taking her daughter and grandchildren.

{¶ 118} In support of his argument that counsel were ineffective for failing to present the testimony of Drs. Stinson and Fradkin at the mitigation hearing, Montgomery contends that there was an "overwhelming amount of psychological mitigation testimony that could have been presented." Montgomery asserts that studies indicate that a child who experiences abuse and neglect has a significantly higher chance of committing violent crimes as a juvenile and as an adult and that childhood abuse has been found to cause mental illness throughout the individual's life. Montgomery argues that "Dr. Fradkin's bill reflects that he did not review any records, and that he had a single interview with Montgomery that lasted approximately one hour."

{¶ 119} It is true that while defense counsel received funding for and retained both a forensic psychologist and an expert in childhood sexual abuse, they did not present any expert testimony or expert reports in mitigation. The record contains itemized bills provided to defense counsel from both Drs. Stinson and Fradkin, showing that each expert met with Montgomery and prepared a report. Additionally, the experts' bills show that they communicated with each other during the pretrial stage. Dr. Stinson's bills reveal that he spent nearly 16 hours reviewing records, met with Montgomery for evaluation five times before the trial

date, and met with Montgomery's defense team multiple times. Dr. Fradkin's bill does not reflect any charges for record review.

{¶ 120} A trial attorney's decision "to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997). We will not " 'infer a defense failure to investigate from a silent record.' " *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 65, quoting *Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 244; *see also State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 288 (defense counsel's decision not to present testimony of retained experts in mitigation was reasonable trial strategy because "[n]othing in the record shows that this decision was the result of an inadequate investigation").

{¶ 121} Moreover, Montgomery's argument that defense experts in psychology and child sexual abuse would have tipped the scales in favor of a life sentence actually contradicts the record evidence demonstrating his competence and in particular, his decision to waive his right to a mental examination prior to sentencing. Thus, Montgomery has not demonstrated that counsel were ineffective in failing to use experts in mitigation.

### 5. Failure to Object to State's Cross-Examination of Mitigation Witness and Failure to Prepare Mitigation Witnesses

{¶ 122} Montgomery also faults defense counsel for failing to object to the state's use of Montgomery's FCCS and Starr Commonwealth records during its cross-examination of defense witnesses Roberta Thomas and Timothy Brown. He also contends that defense counsel failed to adequately prepare Thomas and Brown for testifying at the mitigation hearing.

{¶ 123} Former FCCS employees Thomas and Brown testified during Montgomery's mitigation hearing. Thomas and Brown, FCCS youth leaders in the late 1980s, had become acquainted with Montgomery when he lived at FCCS's

Franklin Village beginning in 1986. Both witnesses had positive views of Montgomery and felt that his youthful behavioral problems were caused in large part by his unsupportive family structure.

{¶ 124} On cross-examination, the state used Montgomery's FCCS records and records regarding Montgomery's therapy sessions at the Willson Family and Child Guidance Clinic to undermine the witnesses' recollection of Montgomery's behavior. Neither witness had any knowledge of these records and were unable to corroborate most of the information the assistant prosecutor read from the records. The panel sustained a defense objection to the state's attempt to get Brown to corroborate certain information in the records, because Brown had no knowledge of the records and did not create them.

{¶ 125} When the state sought to admit the FCCS records into evidence during its case in mitigation, defense counsel initially objected. However, defense counsel later agreed with the state to submit the records as joint exhibits.

{¶ 126} This aspect of Montgomery's ineffective-assistance claim fails for several reasons. First, the record demonstrates that defense counsel did object to the state using the records during Brown's testimony. Moreover, cross-examination "shall be permitted on all relevant matters," Evid.R. 611(B), and "the scope of cross-examination is within the sound discretion of the trial court," *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 99. Because the state was using the records only to test, by cross-examination, the witnesses' recollections of Montgomery's behavior at FCCS's Franklin Village, a defense objection most likely would not have been sustained. Finally, counsel's decisions to withhold further objection and to submit the records as joint exhibits "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 127} Montgomery's argument that counsel failed to adequately prepare Thomas and Brown for cross-examination also fails. The record demonstrates that

defense counsel spoke to both witnesses prior to their testimony and met with Brown at least once. Beyond those facts, the record does not show the extent of defense counsel's witness preparation. In addition, even if the record did support Montgomery's claim that counsel failed to prepare Thomas and Brown, he has not demonstrated prejudice as a result of counsel's allegedly inadequate witness preparation.

### 6. Presenting Antagonistic Information to Three-Judge Panel

{¶ 128} Montgomery challenges defense counsel's decision to inform the panel about threatening phone calls that they received from two of Montgomery's aunts after the mitigation hearing. He argues that the substance of the aunts' calls "diminished" the mitigation evidence and that had counsel not brought them to the panel's attention, the "result of the mitigation phase would have been a life sentence."

{¶ 129} The day after the mitigation hearing, the panel convened with counsel[1] to discuss the threatening nature of the telephone calls. Defense counsel explained that she first spoke to one of Montgomery's aunts who expressed "concern[ ] about things that had been said about her sister [Montgomery's mother, Carol] and demanded in a threatening way that [defense counsel] clear her sister's name and said that the family wanted [defense counsel] off of the case immediately." At the panel's request, defense counsel played the voicemail message left by his other aunt, Linda Montgomery. In the message, the caller disputed some of the mitigation evidence and stated, "I don't appreciate how y'all trying to slander my sister's name. My sister did 20 years of service in the Army; 25 years as a social worker. * * * You trying to save this life. [Montgomery's] life don't need to be saved if it's going to hurt the family. * * * Now, get my sister's name cleared, and I mean that."

---

[1] Defense counsel waived Montgomery's right to be present for this hearing.

**{¶ 130}** Defense counsel affirmed that they played the message for Montgomery and told him about the other call but that "he indicated that he still wants us to remain as his attorneys." The presiding judge pointed out that "one of the significant things, of course, is that the case, for all practical purposes, [has] concluded since we were deliberating, dealing with the sentence in this case." Defense counsel confirmed that they felt they could continue representing Montgomery "uninfluenced by these phone calls."

**{¶ 131}** Our scrutiny of counsel's decision to inform the panel about the telephone calls requires that we make "every effort * * * to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Defense counsel's decision to inform the panel about the telephone calls did not fall outside the wide range of reasonable professional judgment. The callers were threatening and made specific demands that counsel cease representing Montgomery. Because the court had appointed counsel in this case, it seems reasonable that counsel would want to inform the court of the incident and of Montgomery's request that they remain his counsel. While the caller did attempt to discredit significant portions of the defense mitigation case, the caller was not under oath, and the evidentiary portion of the mitigation hearing had concluded.

**{¶ 132}** Further, the information was presented to a three-judge panel, "which was capable of drawing the correct conclusion" from this event. *State v. Frazier*, 61 Ohio St.3d 247, 254, 574 N.E.2d 483 (1991). Montgomery has not pointed to any place in the transcript or in the sentencing opinion where the panel referred to that call, much less considered it in its deliberations. *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968) ("We indulge in the usual presumption that in a bench trial in a criminal case the court considered only the relevant,

material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary").

{¶ 133} Montgomery has not shown that his counsel were ineffective in informing the panel about the phone calls.

### 7. Cumulative Ineffective Assistance

{¶ 134} Finally, Montgomery contends that the "cumulative effect of counsel's errors and omissions violated [his] Sixth Amendment right to effective counsel." However, as demonstrated above, Montgomery has not shown that he received ineffective assistance.

{¶ 135} In conclusion, Montgomery has not shown that he was denied his right to the effective assistance of counsel, and we reject proposition of law No. 3.

### D. Introduction of Graphic Photographs

{¶ 136} In proposition of law No. 5, Montgomery asserts that he was denied due process of law and a fair trial when the panel admitted and considered gruesome photographs "with no probative value" during the plea and mitigation hearings. Montgomery argues that "[e]ven though the evidence in this case was heard by a three-judge panel and a not a jury, the extensive use of these numerous, graphic photographs nevertheless would have a strong emotional impact on the fact-finders."

{¶ 137} We apply a "stricter evidentiary standard for the introduction of photographs" in capital cases than in other contexts. *State v. Morales*, 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267 (1987). Under this standard, gruesome photographs are admissible only if the "probative value of each photograph * * * outweigh[s] the danger of prejudice to the defendant and, additionally [is] not * * * repetitive or cumulative in nature." *Id.* at 258. "The trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Issa*, 93 Ohio St.3d

49, 64, 752 N.E.2d 904 (2001). And again, we presume that the panel " ' "considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." ' " *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 199, quoting *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987), quoting *White*, 15 Ohio St.2d at 151, 239 N.E.2d 65.

{¶ 138} Finally, because Montgomery pleaded guilty, "the admission of gruesome crime-scene or autopsy photographs could not have affected the guilty verdict." *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 136. Therefore, we will consider only the effect of the allegedly erroneously admitted photographs upon the panel's decision to impose the death penalty.

{¶ 139} At the start of the mitigation hearing, the panel overruled a defense objection to the readmission of all of the evidence "deal[ing] with the aggravating circumstances." Notwithstanding Montgomery's argument, the photographs portray the nature and circumstances of the triple homicide by documenting the location and position of the three bodies, blood stains throughout the scene of the crime, blood stain evidence located in the victim's vehicle, and other evidence located at the scene. Moreover, the autopsy photographs illustrate the testimony regarding the autopsy reports and demonstrate Montgomery's specific intent to kill. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 109 (no abuse of discretion in admission of gruesome photographs depicting specific injuries to four-year-old arson victim).

{¶ 140} On balance, the photographs were relevant and illustrative of the aggravating specifications, the cause of death as to each victim, the condition of the murder scene, and Montgomery's own injuries, which were probative of his liability for the three deaths and probative "with regard to the showing of intent and deliberation" on his part, *Morales*, 32 Ohio St.3d at 258, 513 N.E.2d 267.

**{¶ 141}** Further, Montgomery has not rebutted the presumption that the panel considered " 'only the relevant, material, and competent evidence in arriving at its judgment.' " *Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, at ¶ 66, quoting *White*, 15 Ohio St.2d at 151, 239 N.E.2d 65. In contrast to his assertion that "[t]hese gruesome images would have roused the fact-finders' emotions during its [sic] sentencing deliberations," the panel in its sentencing opinion specifically stated that it "gave scant consideration to the photographs." A trial court may allow evidence presented in the guilt phase to be repeated in the mitigation phase, and it was not improper for the court to readmit the photographs for the mitigation phase in this case. *See State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 73.

**{¶ 142}** Accordingly, we reject Montgomery's fifth proposition of law.

### E.        Settled Issues

**{¶ 143}** Proposition of law No. 6 presents six constitutional arguments regarding Ohio's capital-punishment scheme that we have considered in numerous other cases. We have previously rejected each of Montgomery's challenges to Ohio's capital-punishment scheme. *See*, *e.g.*, *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 279-280 (listing cases).

**{¶ 144}** Montgomery also argues that Ohio's death-penalty statutes violate international law and treaties. We have also held in prior cases that Ohio's death-penalty statutes do not violate international law and treaties and do not thereby offend the Supremacy Clause. *Id.* at ¶ 279-280.

**{¶ 145}** Accordingly, we summarily reject proposition of law No. 6.

### F.        Cumulative Error

**{¶ 146}** In proposition of law No. 7, Montgomery argues that cumulative error occurring during the proceedings requires this court to reverse his conviction and grant him a new trial. We reject this proposition.

**{¶ 147}** A conviction will be reversed for cumulative error only "when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

**{¶ 148}** Montgomery has not shown that any errors occurred during the plea hearing or the mitigation phase of his capital case. Thus, he cannot show that there was a cumulative effect of error in his case, and the cumulative-error doctrine does not apply.

**{¶ 149}** Therefore, we reject proposition of law No. 7.

### G.    Sentencing Opinion

**{¶ 150}** In proposition of law No. 4, Montgomery argues that his death sentences are void under the state and federal constitutions because the panel "did not * * * weigh the aggravating circumstances for each count separately and make a separate [sentencing] determination."

**{¶ 151}** Montgomery was convicted of four counts of aggravated murder and all capital specifications attached to those counts. In its sentencing opinion, the panel indicated that it merged the two counts related to Tahlia (Counts 2 and 3) and the two counts related to Tyron (Counts 4 and 5). Montgomery's argument hinges on the panel's reference, in the sentencing opinion, to the "four" aggravating circumstances that it "considered in the weighing process." These "four" aggravating circumstances included the R.C. 2929.04(A)(5) course-of-conduct specification, the R.C. 2929.04(A)(9) killing-of-a-person-under-13 specification (listed twice), and the R.C. 2929.04(A)(3) escaping-detection specification. Montgomery also takes issue with the panel's description of its weighing process:

> The Panel reviewed the mitigating factors, individually and collectively, and discussed them at great length. After a complete discussion, each member of the Panel presented an individual review of the aggravating circumstances and the mitigating factors. In essence, the Panel concluded that the mitigation evidence paled in comparison to the aggravating circumstances. * * * As a result, when the Panel voted after all discussion had been completed, each judge gave a summary of his opinion as to the weighing process, and each judge individually and independently concluded that in this case, the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.

It is Montgomery's contention that the panel's erroneous account of "four" aggravating circumstances combined with the description of the weighing process "leads to the conclusion that the panel weighed all the aggravating circumstances from both counts together against the mitigating factors." We disagree.

{¶ 152} Looking at the sentencing opinion in isolation, as Montgomery has, supports the conclusion that the panel failed to individually weigh the aggravating circumstances applicable to each aggravated-murder count separately. These statements seemingly violate our holding that "[w]hen a capital defendant is convicted of more than one count of aggravated murder, the penalty for each individual count must be assessed separately. Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count." *State v. Cooey*, 46 Ohio St.3d 20, 544 N.E.2d 895 (1989), paragraph three of the syllabus.

{¶ 153} However, the panel's statements at a presentencing hearing held in this case suggest that the panel did evaluate each count separately:

> [T]his Court finds that specifications *in respective counts* that related to a course of conduct * * * contained in Counts Two, Three, Four and Five merge for sentencing purposes. Since Counts Two and Three and Counts Four and Five have already been found to merge for sentencing purposes, this Court, therefore, had four aggravating circumstances, *as placed in their respective counts* to weigh against the mitigating factors presented by the defense.

(Emphasis added.) In addition, the panel signed individual verdict forms for each victim. The verdict on Counts 2 and 3 states, "We * * * hereby find that the Aggravating Circumstances *as set forth in Counts Two and Three*, merged, outweigh the Mitigating Factors presented, beyond a reasonable doubt." (Emphasis added.) The same language appears in the panel's verdict on Counts 4 and 5.

{¶ 154} Applying *Cooey* in a subsequent case, we found that an ambiguous statement in a sentencing opinion as to the weighing of aggravating circumstances was sufficiently clarified by reference to the verdict forms, which showed that the panel had "made a specific finding that the aggravating circumstances present *with respect to that aggravated murder* outweighed the mitigating factors." (Emphasis sic.) *State v. Keene*, 81 Ohio St.3d 646, 664, 693 N.E.2d 246 (1998). Applying *Keene*, we conclude that the verdict forms in this case sufficiently clarify the panel's ambiguous statements in the sentencing opinion and, thus, that the panel's weighing did not conflate the aggravating circumstances applicable to Counts 2 and 3 with the aggravating circumstances applicable to Counts 4 and 5.

{¶ 155} Even if we were to find the panel's sentencing opinion erroneous under *Cooey*, we have previously held that "serious deficiencies in the trial panel's death penalty written opinion" can be " 'rectified by this court's careful independent reweighing.' " *State v. Fox*, 69 Ohio St.3d 183, 191, 631 N.E.2d 124 (1994), quoting *State v. Lott*, 51 Ohio St.3d 160, 170, 555 N.E.2d 293 (1990);

*accord State v. Mitts*, 81 Ohio St.3d 223, 235, 690 N.E.2d 522 (1998) (holding that independent reweighing could cure trial court's failure to separately weigh the aggravating circumstances in each count of aggravated murder, incorrect statement that no evidence of statutory mitigating factors existed, improper merger of capital specifications, and failure to explain why the aggravating circumstances outweighed the mitigating factors).

## H.      Independent Sentence Evaluation

{¶ 156} Under R.C. 2929.05(A), this court must independently review Montgomery's death sentence. In conducting this review, we must determine whether the evidence supports the panel's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether Montgomery's death sentence is appropriate and proportionate to those affirmed in similar cases. *Id.*

## 1. Aggravating Circumstances

{¶ 157} The three-judge panel convicted Montgomery of three capital specifications with regard to the aggravated murder of Tahlia and two capital specifications related to the aggravated murder of Tyron. In particular, the panel found that Montgomery murdered both children as "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender" under R.C. 2929.04(A)(5) and that Montgomery "purposefully caused the death of another who was under thirteen years of age at the time of the commission of the offense, and either the offender was the principal offender in the commission of the offense or, if not the principal offender, committed the offense with prior calculation and design" under R.C. 2929.04(A)(9). In addition, as to Tahlia, the panel found that Montgomery committed the offense "for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender" under R.C. 2929.04(A)(3).

{¶ 158} The state produced sufficient evidence of all three individual specifications, as applied respectively to the two victims.

### a. Course of Conduct—R.C. 2929.04(A)(5)

{¶ 159} The murders of Tia,[2] Tahlia, and Tyron were purposeful and part of a single continuing course of conduct. Montgomery murdered all three victims inside Tia's apartment on November 26, 2010. Therefore, the murders were directly linked in time and location. *See State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, syllabus, ¶ 52 (factors such as time, location, a common scheme or a common psychological thread can establish the factual link necessary to prove a course of conduct).

### b. Murder of Person under the Age of Thirteen—R.C. 2929.04(A)(9)

{¶ 160} The state also presented evidence that at the time of their deaths, Tahlia was nine years old and Tyron was two years old. Accordingly, we find that the evidence was sufficient to support Montgomery's conviction on the R.C. 2929.04(A)(9) specification attached to Counts 2 through 5.

### c. Escaping Detection—R.C. 2929.04(A)(3)

{¶ 161} Finally, as we explained in our analysis of proposition of law No. 1, there was sufficient evidence to support Montgomery's conviction for killing Tahlia to escape detection, apprehension, trial or punishment for another offense—namely, murder.

### 2. Mitigating Evidence

{¶ 162} For each murder, we must weigh the aforementioned aggravating circumstances against any mitigating evidence about "the nature and circumstances of the offense" and Montgomery's "history, character, and background." R.C. 2929.04(B); *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d

---

[2] Montgomery was charged with the purposeful murder of Tia, in violation of R.C. 2903.02. This was not indicted capitally, and thus is not an independent aggravating circumstance. However, Tia's murder is appropriately considered as evidence of the R.C. 2929.04(A) specification.

1051, ¶ 193. In addition, we must consider the following statutory mitigating factors: victim inducement; duress, coercion, or strong provocation; mental disease or defect; youth; lack of significant criminal history; accomplice only; and any other relevant factors. R.C. 2929.04(B)(1)-(7).

{¶ 163} During the mitigation hearing, the defense presented seven witnesses. Montgomery also made an unsworn statement to the panel.

{¶ 164} Montgomery was 37 years old in 2012, when his mitigation hearing took place. Multiple family members, including two adult sons and a younger brother, testified that Montgomery had generally been a positive influence in their lives and that they would continue to visit him in prison. However, both of Montgomery's sons who testified admitted that he had not lived with them for many years.

{¶ 165} His younger cousin, Cyrill Montgomery, testified that he and Montgomery were close when they were growing up. At one point when the two were teenagers, Cyrill moved into the house of Montgomery's mother, Carol Montgomery. Cyrill testified that Carol drank "King Cobra" every day and that she also "used drugs." To Cyrill's knowledge, Montgomery and his stepfather, Mike Stovall, "didn't really have a relationship."

{¶ 166} Cyrill also testified that he and Montgomery "always had fun," that they "exercised a lot," and "just had lots of fun," when they were teenagers. In Cyrill's view, "there's still some good that's in [Montgomery]," and he told the panel, "I'm praying for y'all that y'all able to make the correct choice. But I'm asking that y'all find it in your heart to let my cousin live. * * * My condolences to [Hendricks's] family."

{¶ 167} Cyrill's wife, Tanika Montgomery, also testified on Montgomery's behalf. Tanika is a trained nurse who currently teaches at Mount Carmel College of Nursing. Tanika described Montgomery's family as "one that is [in] a cycle * * * of poverty and drug use and verbal abuse. That's what I witness when I'm around

* * * their family.  That's what I've seen."  She admitted that she was somewhat hesitant to testify because she still loves his family but that she "just [doesn't] agree with some of the practices that they have."  When asked to elaborate, she said, "The cycle of nobody graduating from high school, people abusing drugs, cussing out your children, letting your children run wild."

{¶ 168} Tanika personally observed the adults in Carol's house "drink[ing and] smoking weed most of the time," and stated that she has seen "people smoke weed around their kids."  Tanika described Carol's household as one with no boundaries and said that, as a parent, Carol was "disengaged."  She further explained that, in her view, an engaged parent is one who is "active" in the lives of his or her children, who "go[es] to school meetings," and who would "discipline them if they do something."  In contrast, what Tanika witnessed in Montgomery's family were parents who did not make their children a priority in their lives, who would "let them run around and just do whatever they want[ed] to do," and who instead of being engaged would "party and drink and cuss [the] kids out."

{¶ 169} Tanika also testified that even knowing what Montgomery was charged with, she still believes him to be a good person, that she has "never seen him act out in anger," that Montgomery "was kind of like more of the person that was calming people down."  She told the panel that Montgomery had "played games" with her own children and that he "always showed love towards children."  She added that "by him living, he has to deal with the consequences of his actions."  In conclusion, Tanika opined that if Montgomery lived, her children "can look at [Montgomery] as an example for what not to do and he can always also influence them positively by speaking into their lives."  She said that Montgomery "still has hope.  There's still something that's inside of him that's worth living."

{¶ 170} Roberta Thomas and Timothy Brown, former FCCS youth leaders, testified that they contacted Montgomery's attorneys when they heard about the criminal charges he was facing.

**{¶ 171}** Thomas worked for FCCS beginning in the late 1980s and became acquainted with Montgomery when he was a resident of her cottage at Franklin Village. In Thomas's view, Montgomery was inappropriately placed into "Cottage 5," which was for older boys, because Montgomery "was such a big guy at that age." In her opinion, "nobody really wanted to deal with him," including the staff. Thomas testified that the boys had the opportunity to earn the right to go home for the weekend, and that when Montgomery earned that right, "some of the times he didn't get to go home because his mom didn't come and get him." Thomas said that "Franklin Village was [Montgomery's] home at that time" and that she would "do consequences or whatever, * * * to show consistency helping him understand what family life and proper family values are."

**{¶ 172}** Thomas's memories of Montgomery's home life echoed Tanika's testimony that Montgomery "had no structure, no discipline or anything to go with it." Thomas admitted that at times, Montgomery "would act out" but stated that he wasn't "overaggressive in acting out." She also acknowledged that as a teenager, Montgomery would not always accept responsibility for his actions and described him as "a normal kid in regards if he could get away with something, he would do that." Thomas testified that there was "no consistent follow-through with him" from his mother.

**{¶ 173}** Ultimately, Thomas opined that FCCS failed Montgomery. She explained that "Children Services was moving them through, getting them out. Not really giving them what they needed to become what they need to be in society." She implored the panel to take Montgomery's family background into consideration and stated that Montgomery is now "taking responsibility for the actions that he caused," and that is "a real big step for a kid that never had to do that."

**{¶ 174}** Like Thomas, Brown was a youth leader in Cottage 5. Brown told the panel that he has "very vivid" memories of Montgomery, who "was a good kid

in comparison to a lot of the kids that we had in and out of the system there." Brown testified that Montgomery "was not a problem child" for him and that he "cannot remember ever having to deal with him on a discipline level." He described the teenaged Montgomery as "respectful" and "responsive to the things that we would ask him to do." However, on cross-examination, Brown admitted that he knew Montgomery had discipline problems in other cottages at FCCS, including "some sexual acting out."

{¶ 175} Brown also interacted with Carol Montgomery during the time that Montgomery was housed at Franklin Village. Like Thomas, Brown recalled that Montgomery would earn weekend passes home but that Carol would not always pick him up. Brown explained that

a lot of parents took advantage of the Village because back in the 80s it was like a warehouse and parents would simply drop their kids off. Not necessarily because they were having problems but they needed a vacation from their children. And Carol fell right into that type of parent. That was simply use the system as a way of baby-sitting their child and not allowing them to come home. * * *

And meeting her, she was not a nasty person but you could tell that her interest was not in Caron.

In conclusion, Brown opined that he did not "believe that Carol wanted [Montgomery] home the majority of the time because she had eligibility to take him home."

{¶ 176} The parties jointly offered two exhibits, Joint Exhibit 1 and Joint Exhibit 2, containing Montgomery's FCCS records, after having agreed upon certain redactions.

54

**{¶ 177}** Records included in Joint Exhibit 1 reveal that Montgomery's mother viewed Montgomery as the source of all of her problems and that she turned to FCCS after he was suspended from school. She "was very concerned that she did not have ample babysitting arrangements" for Montgomery. Carol told the FCCS intake worker that "she would be locking [Montgomery] in the home while she attended school and went to work." Despite being warned not to leave him locked in the house, Carol "did so, however, and [Montgomery] climbed through an upstairs window and went to his mother's place of employment." The intake summary also indicates that Carol "then decided to lock [Montgomery] in her car outside of her place of employment during her working hours."

**{¶ 178}** Further evidencing his mother's lack of support and concern for him, the records state that Montgomery "did not receive mental health counseling after he was sexually violated as a child, which could be contributing to some of his inappropriate behaviors." Carol told the FCCS intake employee that "her marriage to [Montgomery's stepfather] would be a satisfying relationship if it were not for [Montgomery]." During Montgomery's teenage years, Montgomery's stepfather "terminated his employment with the railroad in order to 'hustle.' " His stepfather also used and sold drugs, and his mother has "a history of associating with negative male figures."

**{¶ 179}** In his unsworn statement, Montgomery apologized for what he did, admitted that it was a "selfish act" and that he knows that he "hurt a lot of people, Tia's family, [his] family, everybody who ever knew [him] or cared about [him]." He prayed that the panel would "have mercy on [his] soul," to allow him to "at least be some type of dad from prison for [his remaining kids]." He specifically apologized to Tia's mother "because she trusted me with her daughter and our kids. And I took them." Montgomery told the panel that in his view, his mother, who was a single parent, "did her best with [him]." He said that he "was a mess-up," and was "in trouble."

**{¶ 180}** In closing, Montgomery again apologized specifically to Tia's mother and said, "I feel like I betrayed you.  I'm sorry for taking Tia, Tahlia, and Tyron."

### 3.  Categorization of Mitigating Factors

**{¶ 181}** There is nothing mitigating about "the nature and circumstances of the offense," and there is no evidence of any of the statutory mitigating factors described in R.C. 2929.04(B)(1) through (6).  Instead, all of the evidence presented in mitigation falls under the rubric of "history, character, and background," or "[a]ny other factors that are relevant."  *See* R.C. 2929.04(B)(7).

**{¶ 182}** Montgomery presented significant evidence of his difficult childhood and unsupportive family structure, as well as some evidence of his good character.  Multiple witnesses testified that Montgomery grew up in a chaotic home, that his mother blamed him for problems in her life, and that family members were, in the words of his cousin's wife, in a "cycle of nobody graduating from high school, people abusing drugs, cussing out [their] children, letting [their] children run wild."

**{¶ 183}** His adult children testified that he has been supportive of them even though he has not always been around them.  Montgomery tries to be a positive role model to his remaining children and his younger brother by encouraging them not to follow in his footsteps and warning them to stay away from the wrong types of people.  His cousin has nothing but good memories of growing up with Montgomery and still sees him as a good person, despite the crimes he committed in this case.  All of his family members testified that they would maintain a relationship with Montgomery even when he is incarcerated.

**{¶ 184}** Montgomery's cousin's wife, Tanika, did not want to testify for fear that she would offend his family.  She testified because she strongly believes that Montgomery still has value as a human being and that "there's always qualities within somebody that makes them a good individual."  Tanika and her husband

Cyrill, who is Montgomery's first cousin, testified to the chaotic household Montgomery was raised in, with its complete lack of boundaries and its members' drug use and drinking, which often happened around the children. In conclusion, Montgomery's relationship to his surviving children, brother, and cousins and their mutual desire to maintain the close relationship is entitled to some weight.

**{¶ 185}** In his unsworn statement, Montgomery apologized to the Hendricks family and to his own family, and he acknowledged that he let everybody down. Despite the compelling evidence that his mother did not care for him and held him responsible for her failures, Montgomery accepted responsibility for his role in the breakdown of that relationship. Montgomery also pleaded guilty to the capital indictment with no promise for leniency in sentencing. Montgomery's expressions of remorse and remorseful behavior deserve some weight.

### 4. Weighing

**{¶ 186}** As described above, Montgomery presented mitigating evidence deserving of some weight, especially in reference to his unstable childhood that was apparently created in no small part by his unsupportive and reproachful mother.

**{¶ 187}** In our view, however chaotic his background was, the evidence presented does not strongly mitigate the aggravating circumstances relative to Tahlia's murder or to Tyron's murder. Montgomery murdered two young, innocent children, one of whom was his own two-year-old son, and then attempted to make himself appear to be a victim. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 240 (course-of-conduct and murder-of-child-under-13 specifications "overwhelm[ed] the mitigating factors," which included severe personality disorder, lack of criminal history, strong work history, and success as a student). We have held that the child-murder capital specification "is entitled to great weight because it involve[s] the murder of a young and vulnerable victim." *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 282.

**{¶ 188}** On balance, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt as to Tahlia's murder. We also find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt as to Tyron's murder.

### 5. Proportionality

**{¶ 189}** Finally, we conclude that the death penalty is appropriate and proportionate for both children's murders, when compared to death sentences approved in similar cases.

**{¶ 190}** We have upheld death sentences for other child murders under R.C. 2929.04(A)(9) many times. *See, e.g.*, *Mammone* at ¶ 1, 241 (five-year-old and three-year-old victims); *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 267-268 (three-month-old victim); *Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, at ¶ 1, 119 (12-year-old victim); *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 195-196 (six-year-old victim); *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 1, 79 (six-month-old victim). We have also upheld the death penalty as appropriate for other course-of-conduct murders under R.C. 2929.04(A)(5). *See State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 212; *State v. Awkal*, 76 Ohio St.3d 324, 339-340, 667 N.E.2d 960 (1996); *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 162; and *State v. Combs*, 62 Ohio St.3d 278, 294, 581 N.E.2d 1071 (1991).

**{¶ 191}** Moreover, we have " 'approved death sentences in cases where the witness-murder specification was present alone or in combination with one other specification, even when substantial mitigation existed.' " *Bethel* at ¶ 212, quoting *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 101, and citing *State v. Coleman*, 85 Ohio St.3d 129, 707 N.E.2d 476 (1999), and *State v. Smith*, 87 Ohio St.3d 424, 721 N.E.2d 93 (2000).

### III. CONCLUSION

{¶ 192} We affirm the judgments of conviction and sentences of death entered against Caron Montgomery.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, and KENNEDY, JJ., concur.

O'NEILL, J., dissents, with an opinion.

_____

**O'NEILL, J., dissenting.**

{¶ 193} In this case, we have a defendant, Caron Montgomery, who was admittedly on two prescription medications, Risperdal and Thorazine, when he appeared in front of the court to waive his right to a jury trial and enter a guilty plea to charges of murder and aggravated murder. He was later sentenced to death.

{¶ 194} Montgomery had appeared before the court on numerous occasions prior to changing his plea, and the trial court was well aware that he was taking the prescription medications. Yet, in spite of this, a competency evaluation was neither ordered nor conducted. One would think that before we permit someone under the influence of two strong medications to enter a guilty to plea to any crime, let alone the ultimate crime of aggravated murder, we would want to make sure that the person fully comprehends what he or she is doing.

{¶ 195} This court considered this issue in *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, yet the majority chooses to ignore the mandate set forth in that case: "Additional inquiry is necessary into a defendant's mental state once a defendant seeking to enter a guilty plea has stated that he is under the influence of drugs or medication." *Id*. at ¶ 66. In *Mink*, the defendant was on a prescription medication at the time of his change-of-plea hearing, however, as pointed out by this court, he had undergone two previous competency evaluations that supported the trial court's decision that he was competent at that

time. *Id*. at ¶ 66-68. In the present case, no competency evaluation was ever performed on Montgomery.

{¶ 196} Similarly, in *United States v. Damon*, 191 F.3d 561 (4th Cir.1999), which this court cited in *Mink*, the federal court held that the trial court had "failed to inquire about what effect, if any, Damon's medication had on his ability to make a voluntary plea and to understand the consequences." *Id*. at 565. The majority seems to be satisfied that Montgomery stated in open court that he understood what he was doing, and that he signed a written waiver. This conclusion was bolstered by the opinion of Montgomery's attorney—who was not a medical expert—that Montgomery understood the rights that he was waiving. But if medication prevented Montgomery from truly comprehending his actions, how reliable were his spoken assurances and his signed statement to the contrary? The trial court did not inquire about whether or how the medications affected Montgomery's abilities.

{¶ 197} I believe that more was required under *Mink* and *Damon*. At the very least, when someone is undoubtedly under the influence of a prescription medication when making the decision to enter a guilty plea, the trial court must inquire about the effects of the medication so that it can ensure that the defendant understands the gravity of the situation and comprehends his or her actions. This court should not affirm a conviction, let alone a death sentence, by *guessing* about the mental competence of a defendant. Further inquiry was required before the trial court accepted Montgomery's plea of guilty.

{¶ 198} Accordingly, I must dissent.

––––––––––––––––––

Ronald J. O'Brien, Franklin County Prosecuting Attorney, and Steven L. Taylor, Chief Counsel, Appellate Division, for appellee.

Timothy Young, Ohio Public Defender, Kathryn L. Sandford, Supervisor, Death Penalty Division, and Shawn P. Welch and Lisa M. Lagos, Assistant Public Defenders, for appellant.

January Term, 2016

_____