[Cite as *State v. Kehoe*, 2021-Ohio-548.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

JOHN R. KEHOE,

    DEFENDANT-APPELLANT.

CASE NO. 1-20-20

**O P I N I O N**

Appeal from Allen County Common Pleas Court
Trial Court No. CR 2019 0096

**Judgment Affirmed**

**Date of Decision:  March 1, 2021**

APPEARANCES:

    *Thomas J. Lucente Jr.* for Appellant

    *Jana E. Emerick* for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant John R. Kehoe ("Kehoe") brings this appeal from the judgment of the Court of Common Pleas of Allen County accepting the jury verdicts of guilty of three counts of rape and sentencing Kehoe to prison. Kehoe claims on appeal that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, that he was denied the effective assistance of counsel at sentencing, and that the offenses were allied offenses that should have merged for the purposes of sentencing. For the reasons set forth below, the judgment is affirmed.

{¶2} On January 27, 2019, then Deputy Travis Christy ("Christy") went to the hospital in reference to a sexual assault complaint made by the victim. Doc. 3. The victim told Christy that Kehoe pulled down her pants, forced his fingers inside of her vagina, then forced his penis into her mouth, and eventually penetrated her vagina with his penis. *Id.* Kehoe then pulled her pants up and left the room. *Id.* DNA specimens were recovered from the victim's vagina and taken to the Bureau of Criminal Investigation ("BCI") for analysis. *Id.* On February 12, 2019, Kehoe spoke with Detective Callie Basinger ("Basinger") and denied that anything happened. *Id.* The lab results were provided to Basinger on March 4, 2019, and showed that it was a match to a sample in the system which belonged to Kehoe. *Id.*

{¶3} On April 11, 2019, the Allen County Grand Jury indicted Kehoe on three counts of rape in violation of R.C. 2907.02(A)(1)(c), 2907.02(B), felonies of

the first degree. Doc. 4. All three counts were based upon sexual conduct which occurred while Kehoe knew or had reason to believe that the victim's ability to resist or consent were substantially impaired. *Id.* On April 19, 2019, Kehoe entered pleas of not guilty to all of the counts. Doc. 11. A jury trial was held from January 21 to January 24, 2020. Doc. 127. During the trial, the following evidence was submitted.

{¶4} The victim testified that the incident occurred on January 26, 2019, at the home of Kristina Burkholder ("Kristina") in Allen County, Ohio. Tr. 263. She and Rebekah Burkholder ("Rebekah"), a friend of the victim, had planned to go Kristina's home to drink and hang out as Kristina was Rebekah's mother. Tr. 265. The victim and Rebekah arrived at Kristina's home between 1:30 and 2:30 pm. Tr. 266. At that time, Kristina, Kehoe, and Kristina's son Braxton Burkholder ("Braxton") were present at the home. Tr. 266. Kehoe was engaged to Kristina at that time. Tr. 267. Before going to the home, the victim had only met Kristina and Kehoe one other time and it was a short visit. Tr. 268. All of them were sitting around visiting and listening to music. Tr. 269. Eventually, Kehoe handed the victim a six pack of alcoholic drinks and told her they were for her. Tr. 270. They started doing shots and the victim started drinking the bottles of alcohol beside her. Tr. 271. After the victim finished two bottles of the alcoholic drink given to her, she joined the others in doing shots of alcohol. Tr. 272. The victim testified that she had consumed three or four of the bottles of alcoholic drinks and at least three

double shots of liquor. Tr. 272. The shots were all poured for the victim by Kehoe. Tr. 349.

{¶5} After a while, Rebekah felt ill and went into the bedroom to lie down. Tr. 274. The victim testified that she was lightheaded and could not walk well. Tr. 274. Kristina was sitting in a chair in the living room playing on her laptop at that time. Tr. 275. Kristina then fell asleep in a chair in the living room and the victim went into the kitchen to get some food before returning to the living room to eat. Tr. 277. As she was eating, Kehoe was encouraging her to finish eating and to go lie down in the bedroom with Rebekah. Tr. 279. Kehoe came up behind the victim and pulled her to her feet, and walked her to the bedroom telling her she was going to lie down. Tr. 279. Although she wanted to finish her food, the victim testified that she was not upset with going into the bedroom because the room was spinning and lying down sounded like a good idea. Tr. 280. Kehoe kept in contact with her the whole time as the victim did not believe she could have walked that far by herself without falling down. Tr. 280. The victim then laid on the end of the bed on her side facing inward. Tr. 281.

{¶6} When the victim laid down, she attempted to get her phone to text her friend, Kyle Hicks ("Hicks"). Tr. 283. She could not unlock the phone to use it because she was too intoxicated to make the necessary pattern. Tr. 284. While she was fumbling with the phone, she heard Kehoe say something, but she did not know what it was. Tr. 283. Then she felt her leggings being pulled down. Tr. 283. She

dropped the phone and was not able to locate it right then. Tr. 285. The victim felt like she was unable to move or speak. Tr. 286. After Kehoe had pulled her pants down to her thighs, she felt his fingers in her vagina. Tr. 286. Everything went black for a while at that point and the victim testified that she passed out. Tr. 287. When the victim came to and opened her eyes she found Kehoe with his penis in her mouth. Tr. 287. Kehoe had his hand on the back of her head holding her in place while he was moving. Tr. 288. Then the victim blacked out again. Tr. 288. The next time the victim came too, she felt Kehoe's penis inside her vagina. Tr. 288-89. Kehoe was standing beside the end of the bed at that point. Tr. 289. The victim only retained consciousness for a few seconds before she again blacked out. Tr. 289. Later the victim woke to find Kehoe pulling up her pants and then exiting the room and she started to "freak out". Tr. 290. She found her phone, unlocked it with her fingerprint, and called Hicks, crying hysterically. Tr 290. The victim testified that she did not know if she was making sense on the call, but she was trying to say that she needed to leave. Tr. 292.

{¶7} Rebekah then woke up as the victim was crying and the victim just told her she needed to leave. Tr. 292. The victim indicated that she did not talk to anyone on the way out and was not able to tell Rebekah what happened until they were in the car leaving. Tr. 293. The victim testified that she originally got in the driver's seat to leave as it was her car, but she was unable to drive due to her level of intoxication, so Rebekah drove. Tr. 294. They then left and drove to Rebekah's

house while the victim was on the phone with Hicks. Tr. 295. They arrived at Rebekah's house between 6:45 and 7:00 pm. Tr. 296. Rebekah called her roommate Kaitlyn Groves ("Groves") who told the victim to not shower, but to take off her clothing and put them in a bag, so that is what the victim did. Tr. 297. When Groves arrived, she gave the victim some clothes, and tried to help calm the victim down. Tr. 297. While at Rebekah's home, the victim still felt the effects of the alcohol as she was unable to make full sentences and was slurring her speech. Tr. 298. After they sobered up some, Rebekah took the victim to the hospital where she agreed to having the police notified. Tr. 300.

{¶8} The victim testified that she was not married to Kehoe. Tr. 309. She also testified that she had never indicated that she wished to engage in sexual conduct with Kehoe. Tr. 310. During the evening in question, the victim testified that she was intoxicated to the point of being unable to move or speak clearly and that she was fading in and out of consciousness. Tr. 310.

{¶9} On cross-examination, the victim admitted that she went to Kristina's home knowing they would be drinking. Tr. 320. She admitted to drinking the alcoholic drinks while doing shots. Tr. 323. She also admitted that she drank the alcohol voluntarily. Tr. 344-45. When Kehoe was walking her to the bedroom, the victim stated that she would lay down on the bed with Rebekah. Tr. 326. The victim testified that when she would come back into consciousness, she still could not move her body or speak. Tr. 334. She tried to text Hicks first, but the text was a

jumble of letters, so she instead just called him. Tr. 336. All she could tell him was that she wanted to leave because she was hysterically crying. Tr. 337. That was what woke Rebekah. Tr. 337. At that point in time, the victim was not able to say what happened, she just was able to let Rebekah know that she needed to leave. Tr. 338. While in the car, Rebekah took the phone and spoke with Hicks. Tr. 340. While at Rebekah's house, Hicks was texting her suggesting she go to the hospital and call the police. Tr. 341. The only thing the victim remembered Kehoe saying in the bedroom was that he claimed to be Hicks when she indicated she needed to contact Hicks. Tr. 346.

{¶10} The next witness presented by the State was Hicks. Hicks testified that in January of 2019, he and the victim had been getting to know one another as they decided whether to enter into a relationship. Tr. 352. On January 26, 2019, he received a strange phone call from the victim. Tr. 353. She was very upset and all he could understand was that she was getting her shoes. Tr. 353. He overheard another person say that the victim was drunk and he could tell that from listening to her. Tr. 354. Hicks testified that he did not recall any other calls or texts from the victim. Tr. 355.

{¶11} Braxton testified that the day of the incident was the first time he had met the victim. Tr. 361. She was there because she was one of Rebekah's friends, so she was invited over. Tr. 361. After greeting Rebekah and the victim, he went into his room to play video games by himself. Tr. 362. Within an hour, Kehoe

came into his room to play games with him. Tr. 363. Kehoe was only in the room for maybe 45 minutes. Tr. 363. Braxton left his room one time to go get a drink. Tr. 363. Everyone was still in the living room at that time. Tr. 364. Kehoe came back in to talk to him for a little bit after that, but was not in there for more than a half hour. Tr. 365-66. A couple hours later, Kehoe and Braxton worked on cleaning up the bathroom where someone had gotten sick and Braxton then sat in the living room talking to Kehoe before returning to his room. Tr. 366. After about 30 more minutes, Kehoe told Braxton that the victim and Rebekah were leaving. Tr. 366. Braxton testified that he did not hear any screaming or yelling. Tr. 369. Braxton also testified that he had seen Kehoe intoxicated before and he did not seem drunk on this instance. Tr. 371. According to Braxton, the majority of the time the victim was in the house, Kehoe was in the bedroom with him. Tr. 372-73. On cross-examination, Braxton indicated that he could usually hear loud noises happening in the living room from his bedroom, but he did not hear anything that evening. Tr. 375.

{¶12} Rebekah testified that she met the victim in September of 2018. Tr. 392. They had gone over to her mom's house with the idea of drinking as she had not been able to do so until after her baby was born. Tr. 395. Originally, it was supposed to be a family day with just Rebekah and the baby going over to the house. Tr. 396. According to Rebekah, she and her baby went to the house by themselves. Tr. 397. She did not take any alcohol, but there was alcohol there. Tr. 397. The

victim arrived around 4:30 in the afternoon. Tr. 397. Before the victim arrived, Rebekah was the only one drinking. Tr. 399. Rebekah had consumed four shots before the victim started drinking. Tr. 400-401. Rebekah saw that her mother had fallen asleep with the baby, so she decided to go take a nap on the bed. Tr. 402. When she went into the bedroom, Kristina was asleep in a chair in the living room with the baby, the victim was in the living room, Braxton was in his room, and Kehoe was in the kitchen. Tr. 407-408. When Rebekah got up to go to the bathroom, she saw the victim sitting on the living room floor eating. Tr. 408. Rebekah then returned to the bedroom and went back to sleep. Tr. 409. The next thing Rebekah recalled was waking up to the victim calling Hicks. Tr. 410. As soon as Hicks answered, the victim started crying. Tr. 410. Kehoe then ran into the room and asked what was going on. Tr. 410. Rebekah testified that she told him she didn't know, so he left. Tr. 412. Eventually the victim said she had been raped by John and that they needed to leave. Tr. 411, 413. The victim then went to the car and waited for Rebekah. Tr. 414. According to Rebekah, Kehoe did not kick the victim out of the house. Tr. 415.

{¶13} After she gathered her belongings, Rebekah drove the victim to Rebekah's house. Tr. 417. Rebekah testified that they arrived at her home around 8:40 pm. While at her house, she fell back asleep but kept waking up to the victim talking on the phone to people. Tr. 420. Eventually, Groves arrived at the home and began talking to the victim. Tr. 422. Groves offered to watch the baby, so

Rebekah drove the victim to the hospital. Tr. 422. At the hospital, the victim gave statements to the police and was given an sexual assault exam. Tr. 423. They were at the hospital for more than five hours. Tr. 423. By the time they left, the victim was joking and then the victim drove them back to the house. Tr. 424-25.

{¶14} On cross-examination, Rebekah testified that when she woke up to go to the bathroom, the victim was sitting in the living room eating and the only other people in the living room was Kristina and the baby, who were sleeping. Tr. 430. After Rebekah went back to sleep on the bed, she did not wake again until she heard the victim calling Hicks. Tr. 430. Rebekah testified that she could hear the victim's side of the conversation, but did not know what she was talking about because she was being cryptic and did not tell Rebekah what had happened. Tr. 431. When the victim got off the phone, she told Rebekah that Kehoe had touched her and it was rape. Tr. 432. Rebekah testified that she did not hear Kehoe in the room and she was within touching distance of the victim. Tr. 433. They had been at Rebekah's home for a couple of hours before they went to the hospital. Tr. 439. Rebekah denied that she had ever spoken with Hicks on the phone. Tr. 442.

{¶15} Kristina testified that on the 26th, the victim and Rebekah arrived together because the victim had driven. Tr. 453. The plan was just to hang out and relax. Tr. 453. About an hour after they arrived, Kristina and Kehoe went to get more alcohol. Tr. 454-55. Kristina testified that she was drinking beer, the victim was drinking the alcoholic drink, and all of them were doing shots. Tr. 457-58.

Kehoe was pouring the shots for them, but he was not drinking as many of them as they were. Tr. 458. Eventually Kristina fell asleep in her chair in the living room. Tr. 460-61. Kristina says she only got up once to use the bathroom and did not see anyone besides Rebekah, who was in the bathroom. Tr. 461-62. Kristina then went back to the living room and fell back asleep in the chair until everyone was leaving. Tr. 463. Kristina testified that she tried to stop them from leaving because she did not think they were okay. Tr. 463-64. She did not know why they were leaving at that time. Tr. 465. She spoke with Kehoe and he said that the victim was upset because he asked her to leave, but he did not really tell her why. Tr. 466. Kehoe only told her that the victim was acting crazy so he kicked her out. Tr. 467. After they left, Kristina went into bed and went to sleep, but Kehoe did not go to bed right away. Tr. 469. Kehoe later told her that the victim had tried to seduce him while he was sleeping in his chair. Tr. 470.

{¶16} On cross-examination, Kristina testified that the victim asked them to get the alcoholic drink that she wanted. Tr. 472. Kristina also admitted that she did not know what happened because she was asleep. Tr. 473. When she woke up for the second time, the victim and Rebekah were already in the car ready to leave. Tr. 474. No one said why they were leaving. Tr. 474. Although the victim appeared teary eyed in the car, Kristina never heard her crying. Tr. 476.

{¶17} Groves testified that she knew the victim through Rebekah, who was her roommate. Tr. 483. On the night of January 26, 2019, Rebekah called Groves

saying she did not know what to do and handing the phone to the victim. Tr. 484. The victim was hysterical and Groves could not understand her. Tr. 484. Eventually Groves understood that the victim was claiming to have been raped by Kehoe, so Groves went home. Tr. 484. When she got home, Groves gave the victim a change of clothes and told the victim to bag her clothes in case she wanted to go to the hospital. Tr. 484. Groves did not believe that either Rebekah or the victim were drunk at that point in time. Tr. 488. Groves testified that she eventually convinced them to go to the hospital while she stayed home with the baby. Tr. 489-90. While Groves was talking to the victim, Rebekah was getting texts from Kristina's phone, but she believed they were actually from Kehoe. Tr. 491.

{¶18} Christy testified that at the time of trial, he was employed as a patrolman with the Wapakoneta Police Department, but on the date of the incident, he had been employed as a Deputy with the Allen County Sheriff's Department. Tr. 498. On January 27, 2019, he was dispatched to the hospital for a sexual abuse complaint. Tr. 499. When Christy met the victim at the hospital, she was "very upset, crying, emotional, could barely get a full sentence out without like, um, trying to like get it all together before talking to [him]." Tr. 501. The victim informed him that Kehoe had "inserted his fingers into her vagina and penetrated her vagina with his penis." Tr. 501. The victim also told him that Kehoe had forced his penis into her mouth. Tr. 505. The victim indicated to him that she was intoxicated and had been in and out of sleep while this occurred; that things were "hazy" and "fuzzy"

so she had come to be checked out at the hospital. Tr. 502. Later, Christy returned to the hospital to pick up the sexual assault kit and the victim's clothing. Tr. 503.

{¶19} Harvest Nuss ("Nuss") testified that she is a sexual assault nurse examiner. Tr. 510. Nuss conducted the sexual assault exam on the victim. Tr. 528. As part of that exam, Nuss took a history of the incident. Tr. 530. Nuss identified Ex. 2 as the nurse's statement for the sexual assault kit. Tr. 531. The victim named the assailant and indicated that there was vaginal and oral penetration. Tr. 532. The victim identified the assailant by name as Kehoe. Tr. 533. Nuss testified that she collected DNA samples from various locations on the victim's body. Tr. 540-543. During the exam, Nuss found no external injuries to the victim. Tr. 546. She also found no injures to the internal cavities of the body. Tr. 547. Nuss noted that during the examination, the victim was generally calm and cooperative, but did get tearful during the interview portion of the exam. Tr. 554.

{¶20} Julie Altizer ("Altizer") testified that she is employed as a forensic scientist in the DNA and Forensic Biology section of BCI. Tr. 568. Through the five years with BCI, Altizer has conducted over a thousand DNA comparisons. Tr. 570. Altizer identified Ex. 3 as her report on the comparison of the samples taken from the victim and Kehoe. Tr. 579. Based upon a reasonable degree of scientific certainty, Altizer testified that Kehoe could not be excluded as the source of DNA samples taken from inside the victim's vaginal cavity. Tr. 585. The chance of it belonging to anyone else was rarer than one in a trillion. Tr. 586.

{¶21} Basinger testified that she is a detective with the Allen County Sheriff's Office. Tr. 592. She has been assigned to investigate sexual assault cases. Tr. 592. Basinger spoke with Kehoe on February 12, 2019, and identified Ex. 5 as the recording. Tr. 598. This recording was played for the jury. Tr. 599. Kehoe was later arrested and interviewed by Basinger. Tr. 600. Basinger identified Ex. 6 as a recording of the interview. Tr. 601. This recording was also played for the jury. Tr. 602. A DNA swab was taken from Kehoe to compare to the sample taken from the victim. Tr. 606. On cross-examination, Basinger admitted that she did not interview Rebekah, Groves, Hicks, or Kristina. Tr. 622.

{¶22} Following Basinger's testimony, the State rested its case. Kehoe's counsel moved for a dismissal pursuant to Crim.R. 29. Tr. 629. The trial court overruled this motion. Tr. 631. Kehoe then rested without presenting any evidence. The jury returned verdicts of guilty on all three counts. Doc. 98. Sentencing was delayed to allow for a presentence investigation to be completed. *Id*.

{¶23} Before the sentencing hearing was held, Kehoe filed some pro se motions. These included a motion for defense counsel to meet with him at the jail (Doc. 105), a motion for an extension of time to file post-trial motions (Doc. 106), and a motion for a judgment of acquittal (Doc. 107). On March 12, 2020, the trial court held a sentencing hearing. Doc. 111. The trial court sentenced Kehoe to an aggregate prison term of 23 years. *Id*. Kehoe filed a timely notice of appeal from

this judgment. Doc. 115. On appeal, Kehoe raises the following assignments of error.

### First Assignment of Error

**The trial court denied [Kehoe] effective assistance of counsel during a critical and crucial stage of the criminal proceeding encroaching upon [Kehoe's] rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article 1, Section 10 of the Ohio Constitution.**

### Second Assignment of Error

**[Kehoe's] conviction on three counts of rape was against the manifest weight of the evidence in violation of Article IV, Section 3 of the Ohio Constitution and is contrary to law.**

### Third Assignment of Error

**The trial court erred in denying [Kehoe's] motions for acquittal, where there was legally insufficient evidence to establish each material element of the offenses beyond a reasonable doubt.**

### Fourth Assignment of Error

**The trial court failed to  merge allied offenses of similar import and thus imposed more prison terms than authorized by law.**

In the interests of clarity, we will address the assignments of error out of order.

*Sufficiency of the Evidence*

{¶24} In the third assignment of error, Kehoe claims that the trial court erred in dismissing his motions for an acquittal because the evidence was not sufficient to support convictions on each of the counts. "Under the sufficiency of the evidence standard, '[t]he relevant inquiry is whether, after viewing the evidence

in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Sullivan*, 3d Dist. Hancock No. 5-17-09, 2017-Ohio-8937, ¶ 28, 102 N.E.3d 86 quoting *State v. Potts*, 3d Dist. Hancock No. 5-16-03, 2016-Ohio-5555, 69 N.E.3d 1227, ¶ 12.

{¶25} In each count of the indictment, Kehoe was charged with one count of rape in violation of R.C. 2907.02(A)(1)(c), 2907.02(B). This required the State to prove that Kehoe 1) engaged in sexual conduct 2) with a person not their spouse 3) when the other person's ability to consent is substantially impaired and 4) the offender has reasonable cause to believe that the other person is impaired. R.C. 2907.02(A)(1)(c). "Sexual conduct" is defined as "vaginal intercourse between a male and female, * * * fellatio, * * *; and, without privilege to do so, the insertion, however slight of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A). The testimony of the victim in this case was that Kehoe engaged in three separate instances of sexual conduct. The victim testified that Kehoe inserted his fingers into her vaginal opening. Then she awoke a second time to Kehoe's penis in her mouth and him holding her head. The victim again blacked out and awoke a third time when Kehoe's penis was inside her vaginal cavity. The victim also testified that she was not married to the defendant and that she had consumed three or four bottles of

-16-

alcoholic drinks and several shots of liquor during the evening. She admitted that she was not able to walk to the bedroom by herself, operate her phone correctly, or speak without slurring her words. She testified that Kehoe should have known this as he was the one pouring shots for her and he had to help her to the bedroom. In the bedroom, she repeatedly fell asleep and woke up during the assault. Both Rebekah and Kristina testified that they observed the victim drinking several shots as well as other alcoholic beverages and that Kehoe was pouring the shots. Altizer testified that DNA recovered from the victim's vaginal cavity could not exclude Kehoe as the source and that the odds of that DNA coming from someone other than Kehoe were one in a trillion. Viewing this evidence in a light most favorable to the State, it is sufficient to support the convictions on each of the three counts of rape. The third assignment of error is overruled.

*Manifest Weight of the Evidence*

{¶26} Kehoe claims, in the second assignment of error, that his convictions were against the manifest weight of the evidence. When reviewing a judgment to determine if it is against the manifest weight of the evidence, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Mendoza*, 137 Ohio App.3d 336, 738 N.E.2d 822 (3d Dist. 2000). See, also, *State*

*v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Thompkins* at 387, 678 N.E.2d 541. Although the appellate court acts as a "thirteenth juror," due deference to the findings made by the fact-finder must still be given. *State v. Moorer*, 3d Dist. Seneca No. 13–12–22, 2013-Ohio-650, ¶ 29.

{¶27} A review of the record in this case shows that the jury carefully considered the evidence before it. The victim testified to what she recalled. Her testimony regarding the actions of Kehoe was consistent with what she told Christy, Groves, and Nuss. While there were inconsistencies as to whether she was hysterical when she left Kehoe's home and as to the extent of the victim's intoxication, all of the witnesses at the scene testified that the victim had been drinking heavily and that Kehoe knew she was drinking. Viewing the evidence as a whole, this court does not find that the evidence weighs heavily against conviction or that the jury clearly lost its way creating a manifest miscarriage of justice. The second assignment of error is therefore overruled.

*Allied Offenses*

{¶28} In the fourth assignment of error, Kehoe alleges that the trial court erred by not merging the convictions for the purpose of sentencing because the offenses were allied offenses of similar import. Kehoe claims they should have merged because they were a "single sexual encounter".

**(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**

**(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

R.C. 2941.25.

**Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.**

**As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.**

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 30-31, 34 N.E.3d 892.

{¶29} In this case, we only need to look to the second question. Ohio law has long held that multiple separate and distinct acts of penetration support multiple convictions and sentences. *State v. Hall*, 6th Dist. Lucas No. L-17-1069, 2018-Ohio-

619, ¶ 10; *State v. Hernandez*, 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 48; and *State v. Pippin*, 1st Dist. Hamilton Nos. C-160380, C-160381, 2017-Ohio-6970, ¶ 49.

> **Repeated acts of forcible sexual intercourse are not to be construed as a roll of thunder, an echo of a single sound rebounding until attenuated. One should not be allowed to take advantage of the fact that he has already committed one sexual assault on the victim and thereby be permitted to commit further assaults on the same person with no risk of further punishment for each assault committed. Each act is a further denigration of the victim's integrity and a further danger to the victim.**

*State v. Barnes*, 68 Ohio St.2d 13, 19, 427 N.E.2d 517 (1981) concurring opinion.

If there are multiple, separate and distinct acts of penetration, separated by significant intervening acts, they are separate offenses even if committed within a short time frame. *Pippin, supra* (holding that two instances of fellatio were separate offenses when the first occurred before the victim lost consciousness and the second occurred after the victim lost consciousness). Kehoe was convicted of vaginal penetration of the victim's vaginal cavity by Kehoe's fingers before she lost consciousness. The victim testified she then awoke to penetration of her mouth by Kehoe's penis before she lost consciousness again. The third time the victim awoke, Kehoe's penis was inside her vaginal cavity. These are three separate penetrations separated by a short period of time. Thus, they were separate offenses for which he can be charged, convicted and sentenced separately. The fourth assignment of error is overruled.

{¶30} Kehoe claims in the first assignment of error that he was denied the effective assistance of counsel because between conviction and sentencing, his counsel did not meet with him or file the motions he requested to be filed, specifically a motion for a new trial or for a judgment of acquittal.

> **In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done."** ***State v. Hester*** **(1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus. When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness."** ***State v. Lytle*** **(1976), 48 Ohio St.2d 391, 396–397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.**
>
> **On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent.** ***See Vaughn v. Maxwell*** **(1965), 2 Ohio St.2d 299, 31 O.O.2d 567, 209 N.E.2d 164;** ***State v. Jackson***, **64 Ohio St.2d [107] at 110–111, 18 O.O.3d [348] at 351, 413 N.E.2d [819] at 822.**

*State v. Calhoun*, 86 Ohio St.3d 279, 289, 1999-Ohio-102, 714 N.E.2d 905. "The failure to prove either 1) a substantial violation or 2) prejudice caused by the violation makes it unnecessary for a court to consider the other prong of the test." *State v. Walker*, 3d Dist. Seneca No. 13-15-42, 2016-Ohio-3499, 66 N.E.3d 349, ¶ 20. "To show prejudice, the defendant must show a reasonable probability that, but

for counsel's errors, the result of the proceeding would have been different." State v. Conway, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. "The prejudice inquiry, thus, focuses not only on outcome determination, but also on 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180 quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

{¶31} Here, Kehoe claims that counsel was ineffective because he had to file, without counsel's assistance, three motions between conviction and sentencing. Kehoe also claimed that counsel failed to have contact with him during that time. The record shows that Kehoe did file motions pro se. The trial court dealt with these motions during the sentencing hearing. The trial court noted that on March 10, 2020, Kehoe filed a pros se motion for a new trial. Tr. 4. Counsel informed the court that he had reviewed Kehoe's request and determined that there was no grounds upon which to file the motion. Tr. 5. Although counsel admitted there were no grounds, the trial court considered Kehoe's argument as to why there should be a new trial granted and as to the motion for a judgment of acquittal. Tr. 6-8. The trial court then overruled those motions. Tr. 8. Counsel then continued to argue on behalf of Kehoe at sentencing, including arguing for merger of the sentences and in mitigation of a lengthy sentence.

{¶32} A review of the record shows that although counsel did not file the requested motions, he did not do so not because he was ineffective but rather

because he found no legal basis for doing so. Choosing not to file a motion because, in one's legal opinion, it would be frivolous is not an error. *State v. Robinson*, 108 Ohio App. 3d 428, 433, 670 N.E. 2d 1077 (3d Dist. 1996). Even if it had been an error, Kehoe had no prejudice from the alleged error because the trial court still considered the arguments. Thus, the outcome would not have been any different regardless of whether counsel had filed the motions. The first assignment of error is overruled.

{¶33} Having found no prejudicial error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Allen County is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and SHAW, J.J., concur.**

**/hls**